# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 29, 2012 Session

## STATE OF TENNESSEE v. BRANDON SEAN SUTTON

**Appeal from the Circuit Court for Jefferson County**
**No. 9293      O. Duane Slone, Judge**

**No. E2011-00398-CCA-R3-CD - Filed August 30, 2012**

A Jefferson County jury convicted appellant, Brandon Sean Sutton, of first degree murder, and he received a sentence of life without the possibility of parole. On appeal, appellant argues that (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred when it admitted certain photographs; (3) emotional displays from the victim's family violated his right to a fair trial; (4) the evidence did not support the sentence of life without parole; (5) the victim impact evidence was improper; and (6) the trial judge did not follow proper procedure when selecting the manner in which he removed alternate jurors. After reviewing the record, the parties' briefs, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the Court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Robert L. Jolley, Jr. (on appeal), Knoxville, Tennessee and S. Joanne Sheldon (at trial) Newport, Tennessee, for the appellant, Brandon Sean Sutton.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; James B. Dunn, District Attorney General; and Jeremy Ball, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Facts and Procedural History

*Jury Trial*

The Jefferson County Grand Jury indicted appellant for first degree murder. The trial court held a jury trial on August 11-13, 2010. At the jury trial, the parties presented the following evidence.

Officer Joseph Owens with the Jefferson County Sheriff's Department testified that on January 28, 2007, he responded to a "fight call" on North White Pine Road. While en route to the scene, the dispatcher changed the call and said that a person was not breathing. When he arrived at the address, Officer Owens saw Lisa Stout standing outside the house. Ms. Stout told him that somebody in the house needed help. She went back inside the house, and Officer Owens followed her inside. Once inside, Officer Owens observed the victim, Anthony Scott Gibbs, lying on the couch with his whole head and face covered with blood. There were "real bad gash cuts" in the victim's head. Blood was on the couch, ceiling, and wall. Flesh was on the wall. The victim's head was lying on a black and white pillow. Officer Owens said the victim was gasping for air and gurgling. Officer Owens noticed the victim's jeans were pulled down to his thighs. He said that the victim's underwear was down on his thighs, but they still covered the victim's genitals.

Officer Owens determined that a double-sided axe may have caused the victim's injuries. He said the axe was propped on the victim's leg against the couch. Officer Owens further said blankets and a pair of panties were at the end of the couch. While Officer Owens examined the crime scene, Ms. Stout talked on the phone in the kitchen, which was in the back of the home. Officer Owens said Ms. Stout had blood on her. He did a "sweep" around the house to ensure that nobody was outside. He called for backup and emergency medical services ("EMS"). Deputy Greer was the next person to arrive at the scene. The EMS also arrived and treated the victim on the scene.

On cross-examination, Officer Owens testified that when he arrived on the scene, Ms. Stout kept saying that someone had stolen her car. Ms. Stout told Officer Owens that she and her friends had been drinking that evening. Officer Owens stated that he kept giving Ms. Stout commands, but she would not listen. Ms. Stout was initially talking to a 911 dispatcher on the phone. When she finished talking with the dispatcher, she began talking with someone else. Officer Owens said Ms. Stout seemed "indifferent" about the victim and more

concerned about her car. He said the house in which he found the victim was not spacious and had short ceilings.

James Purkey, a paramedic with Jefferson County EMS, testified that on January 28, 2007, he responded to a call on North White Pine Road. When he arrived at the scene, the victim was lying on the couch with his head toward the door. Mr. Purkey recalled that the victim's "pants and underwear both were down at least to his knees." Mr. Purkey could not find a pulse for the victim and said that the victim was having "spontaneous respirations." He explained that spontaneous respirations meant that the victim was breathing but he was not moving enough air to keep him alive. He suspected that the victim probably had weak blood pressure from the wounds and bleeding.

Mr. Purkey and another paramedic did an initial assessment and determined that the victim was in critical condition. They put the victim on a stretcher, took him to the ambulance, and began rendering aid. Paramedics were on the scene for approximately twenty minutes trying to stabilize the victim. They called for a helicopter to meet them at Talbott Elementary School. When the victim got in the helicopter, he was alive but not breathing on his own.

Randall Charles Kinnick, a paramedic with Jefferson County EMS, testified that on January 28, 2007, he responded to a call on North White Pine Road. When he walked into the house, he saw the victim lying on the couch and "a lot of blood everywhere." He said the victim, who was still alive, had "some type of homemade-looking weapon laying on his crotch[.]" Mr. Kinnick picked up the weapon and laid it on a table. He said the victim was wearing blue jeans that were not pulled all the way up. Mr. Kinnick could not recall whether the victim's genitals were exposed.

Mr. Kinnick stated that the call to this incident stood out because the scene was especially "gory." He recalled that there "was a lot of blood like [the victim] had been there for quite awhile." Mr. Kinnick stated the victim's injuries were mainly on his head. The victim's breathing was at a rate of "twenty per minute." Mr. Kinnick said that was a normal rate, and the victim was alive when they placed him in the helicopter.

On cross-examination, Mr. Kinnick testified that while helping the victim, he focused on his head because that was where the injuries were. He said the room that the victim was in was "pretty small." Mr. Kinnick put latex gloves on his hands en route to the scene and was wearing them when he moved the weapon to the table.

Corporal Donna Greer with the Jefferson County Sheriff's Department testified that she responded to a call from dispatch regarding a crime scene on North White Pine Road.

-3-

When she arrived, Officer Owens, paramedics, and Ms. Stout were there. The victim was on the couch. Corporal Greer said the victim was clothed and was not exposed in any way. Corporal Greer spent most of her time in the kitchen with Ms. Stout and took Ms. Stout's statement that evening.

On cross-examination, Corporal Greer testified that Ms. Stout was talking about someone stealing her car and did not check on the victim's condition. Ms. Stout told Corporal Greer about going to the Midnight Rodeo that night. According to Corporal Greer, Ms. Stout did not mention appellant to her.

Robert Harrison, the victim's best friend, testified that the victim was married and had three children. At the time of his death, the victim and his wife were separated but trying to reconcile. Mr. Harrison was with the victim on January 27, 2007, until the early morning of January 28th. On January 27th, the victim called Mr. Harrison and asked if he wanted to go out that evening. The victim picked up Mr. Harrison at his house. The men then went to Ms. Stout's house around 8:00 p.m.

Several people were at Ms. Stout's house drinking Jack Daniels, and the victim and Mr. Harrison joined them. Eventually, Mr. Harrison, Ms. Stout, Christi Cate, Ted Pollard, and the victim got into Ms. Stout's vehicle and went to the Midnight Rodeo. On the way to the Midnight Rodeo, they stopped to pick up appellant at his mother's house.

The group arrived at the Midnight Rodeo between 10:30 p.m. and 11:00 p.m. They stayed at the bar until it closed. Mr. Harrison said everyone was having fun, drinking, and dancing at the Midnight Rodeo. He further said everyone in the group was drinking except Mr. Pollard. Mr. Harrison danced with Ms. Stout at the bar. At the time, he did not know whether Ms. Stout was in a relationship with anyone. Mr. Harrison had known Ms. Stout for fifteen years. The victim met Ms. Stout on a few prior occasions but barely knew her. The victim did not dance or make any advances toward Ms. Stout. Mr. Harrison did not think the victim had met appellant before that night and said that "everything was kosher" between them on the ride to the Midnight Rodeo.

Mr. Harrison further testified that after leaving the Midnight Rodeo, the group was planning to take appellant home, but appellant wanted to take care of Ms. Stout, who was ill. The group went to Mr. Harrison's house to try to help Ms. Stout. When they arrived, the victim went inside and lay on the couch. The group stayed at Mr. Harrison's house for approximately twenty minutes before leaving. They left because his house did not have electricity and it was cold. Mr. Harrison said that the victim did not want to leave and that he had to shake the victim awake so that he could return to the vehicle. According to Mr. Harrison, the victim was "tired and had a buzz going on [sic]."

-4-

The group returned to Ms. Stout's house. When they arrived, Ms. Stout, who was intoxicated, hit her head on the vehicle's door while attempting to exit. Mr. Harrison grabbed her by her underarms and walked her into the house. Ms. Stout was vomiting in the bathroom, and appellant went into the bathroom to take care of her. The victim went straight to the couch and fell asleep. Mr. Harrison said the victim lay down on the couch with his head on a cushion and one foot hanging off the side of the couch.

Meanwhile, Ms. Cate left to take Mr. Pollard home. The fire in the wood stove went out, so Mr. Harrison went outside, got some firewood, and attempted to restart the fire. Mr. Harrison testified that while he was restarting the fire, appellant screamed at him to "close the f[]ing door." Mr. Harrison screamed "f[] the []damned door" in response. Appellant replied, "I'll shut your f[]ing face." Mr. Harrison said the victim was "out cold" while he was yelling back and forth with appellant. Ms. Cate returned to Ms. Stout's house while Mr. Harrison and appellant were arguing back and forth. Ms. Cate went into the bathroom with Ms. Stout. Ms. Cate and appellant took Ms. Stout into the bedroom to change her clothes.

Mr. Harrison stated that he eventually left with Ms. Cate at 4:00 a.m., leaving the victim, appellant, and Ms. Stout in Ms. Stout's house. Ms. Stout and appellant were in the bedroom when Mr. Harrison left. The victim was on the couch and did not have any injuries. Mr. Harrison said he had seen two axes hanging on the wall in Ms. Stout's bedroom.

On cross-examination, Mr. Harrison testified he gave law enforcement two statements. He did not recall omitting from his first statement that the group stopped to pick up appellant. He remembered that he did not mention the argument about the door in his first statement. Mr. Harrison said he did not see appellant take any pills. Likewise, he did not see Ms. Stout take any pills, but stated that Ms. Stout said she had taken some. Mr. Harrison said that while they were in the vehicle Ms. Stout asked Ms. Cate to get her some cocaine.

Mr. Harrison stated the axes that he saw on the wall were ornamental. Mr. Harrison danced with Ms. Stout at the Midnight Rodeo. He said he did not have sex with Ms. Stout and did not think appellant was upset with him for dancing with Ms. Stout or had a problem with him because appellant never mentioned anything. Mr. Harrison agreed that appellant was "drunk and mouthy" to him while he was trying to start the fire, but he did not think anything about it.

On redirect examination, Mr. Harrison recalled mentioning "a bald-headed dude with tattoos" in his first statement. He further recalled saying that "the bald dude" was in the bathroom with Ms. Stout. He did not know appellant's name then, but he was referring to appellant.

Christi Cate testified she vaguely remembered the events of January 27-28, 2007. She stated she and some friends went to the Midnight Rodeo. Before they left, appellant called Ms. Stout, and the group went to get him. She said six people went to the Midnight Rodeo: herself, appellant, Ms. Stout, Mr. Pollard, Mr. Harrison, and the victim. Ms. Cate had never met the victim before that night. When they got to the Midnight Rodeo, the group began drinking and partying. They stayed at the Midnight Rodeo until it closed at approximately 2:00 a.m. or 3:00 a.m. After leaving the Midnight Rodeo, they went to Mr. Harrison's house. They left Mr. Harrison's house and went to Ms. Stout's house. After arriving at Ms. Stout's house, Ms. Cate took Mr. Pollard home.

When Ms. Cate returned to Ms. Stout's house, the victim was asleep on the couch in the living room, Mr. Harrison was in the kitchen attempting to build a fire, and Ms. Stout and appellant were in the bathroom. Ms. Cate went outside to the vehicle to talk on the phone. When she came back inside, she left the door open. Appellant yelled "shut the . . . door or shut the f[]ing door." Mr. Harrison responded "F[] that . . . door." Ms. Cate asked Ms. Stout if she was cold and offered to shut the door because she had left it open.

While inside Ms. Stout's house, Ms. Cate changed Ms. Stout's panties because Ms. Stout had urinated on herself. She did not remember where she put Ms. Stout's dirty panties and said that they might have fallen on the floor next to the couch. After Ms. Cate changed Ms. Stout's panties, she and appellant placed Ms. Stout on her bed.

Ms. Cate left with Mr. Harrison. When they left, the victim "was on the couch passed out" and appellant and Ms. Stout were in the bedroom. She said everyone was "alive and well" when she left. Ms. Cate stated that before she left, appellant asked her to bring him a knife. She said that appellant was afraid someone was going to "come in on him or something." The only knife that Ms. Cate could find was a fish fillet knife that had jagged edges and no handle.

Ms. Cate had lived at Ms. Stout's house for about two months and recalled that Ms. Stout had axes on the wall in her bedroom. Ms. Stout identified a photograph of the axe and said that when she last saw it, it had a handle. She stated that the axe was hanging on the wall when she left Ms. Stout's house on the morning of the incident. According to Ms. Cate, Ms. Stout also had a dagger on her dresser.

On cross-examination, Ms. Cate testified that she and Ms. Stout had begun drinking whiskey straight from the bottle early on the afternoon of January 27th. Ms. Cate had also smoked marijuana and taken Xanax before leaving Ms. Stout's home that night. She did not recall the group stopping to get beer on the way to pick up appellant but said that if it was in her statement, then it was correct. When appellant got into Ms. Stout's vehicle, he asked Ms.

-6-

Cate if she wanted to smoke a "blunt." They smoked the "blunt" on the way to the Midnight Rodeo.

Ms. Cate said she covered Ms. Stout with blankets when she put her on the bed. She identified a photograph of some blankets at the end of the couch in Ms. Stout's house. She said she covered Ms. Stout with a blanket like the one in the photograph; however, she was unsure if that was the specific blanket because Ms. Stout had a couple blankets like that in her house. She said Ms. Stout had the axes hanging across each other on her wall as decoration. At some point, someone rearranged the axes, and they were laying side by side next to the dresser.

On redirect examination, Ms. Cate testified the victim did not make any advances toward Ms. Stout. The victim did not threaten or provoke appellant in her presence. She said she did not see the victim do anything other than fall asleep on the couch.

Ted Daniel Pollard testified he and appellant had been friends for approximately fifteen years. He did not know the victim before January 27, 2007. He said that on January 27th, he went to the Midnight Rodeo with Ms. Stout, Ms. Cate, Mr. Harrison, and the victim. The group was riding in Ms. Stout's vehicle and stopped to get appellant. After leaving the Midnight Rodeo, they stopped at Mr. Harrison's house. Mr. Pollard said the victim passed out on the couch at Mr. Harrison's house. After leaving Mr. Harrison's house, they went to Ms. Stout's house. Once inside Ms. Stout's house, the victim went to sleep on the couch. Mr. Pollard attempted to help Mr. Harrison build a fire while Ms. Cate talked on the telephone and Ms. Stout and appellant were in the bathroom. He said that appellant twice "hollered out shut the door" because Ms. Cate was "running in and out leaving it open." In his statement to police, Mr. Pollard said appellant and Mr. Harrison "had a few words over the front door" because appellant had gotten loud. He did not recall telling police that appellant told Mr. Harrison to shut his mouth before he came in and shut it for him. Mr. Pollard asked Ms. Cate to take him to his father's house. Appellant, Ms. Stout, the victim, and Mr. Harrison were still at Ms. Stout's house when Mr. Pollard and Ms. Cate left. Mr. Pollard said the victim was uninjured and sleeping on the couch when they left.

Mr. Pollard said Ms. Stout "was kind of a sloppy drunk," and appellant was angry about having to take care of her. He recalled that appellant had gotten a little upset with Ms. Stout for dancing with Mr. Harrison at the Midnight Rodeo. He said Ms. Stout did not dance with the victim, and the victim did not make any advances toward Ms. Stout. The victim approached Mr. Pollard at the Midnight Rodeo and asked him about appellant. Mr. Pollard told the victim appellant's name and said that he and appellant were good friends. According to Mr. Pollard, the victim replied, "[W]ell, I hate that for you because Robby's a friend of

mine." Mr. Pollard said he took the victim's comment "with a grain of salt." Mr. Pollard anticipated animosity between appellant and Mr. Harrison because of Ms. Stout.

On cross-examination, Mr. Pollard testified he did not have anything to drink until approximately 1:00 a.m. He said everyone else in the group began drinking, smoking marijuana, and taking pills before they left for the Midnight Rodeo. Ms. Stout told Mr. Pollard that she wanted appellant to ride with them to the Midnight Rodeo and asked if he would pick up appellant. Mr. Pollard saw Mr. Harrison dancing with Ms. Stout and denied that they were all over each other. However, he said that if Ms. Stout had been his girlfriend, it would have upset him because she should not have been dancing with anyone else. Mr. Pollard recalled Ms. Stout asking Ms. Cate to get her some cocaine.

Lisa Stout testified appellant was a former boyfriend whom she had dated off and on for two years. On January 27, 2007, she and Ms. Cate were at her house drinking whiskey. At some point, Ms. Stout's father and Mr. Pollard joined them. While Ms. Stout, Ms. Cate, and Mr. Pollard were leaving to go to the Midnight Rodeo, Mr. Harrison and the victim pulled into her driveway. The group told them they had a sober driver and were going to the Midnight Rodeo. The victim and Mr. Harrison asked to ride with them to the Midnight Rodeo, and Ms. Stout agreed.

Ms. Stout, Ms. Cate, Mr. Pollard, Mr. Harrison, and the victim got in the vehicle. On the way to the Midnight Rodeo, they stopped and picked up appellant. At the Midnight Rodeo, Mr. Harrison wanted to dance with Ms. Stout. Ms. Stout told him that she did not want to dance with him because appellant would get mad. Later, someone dared Ms. Stout to drink a pitcher of beer, and she accepted the dare. After drinking the pitcher of beer, she picked up her drink that was on the table and "killed it." She said that there was a "purplish" pill at the bottom of her glass. She showed the glass to appellant and told him there was a pill at the bottom.

Ms. Stout further testified that she became ill after drinking the pitcher of beer and her drink. She stated she had never been that drunk before. She remembered going to Mr. Harrison's house after the Midnight Rodeo but did not get out of the vehicle. The group left Mr. Harrison's house and went to Ms. Stout's house because Mr. Harrison did not have power and it was cold. Ms. Stout stated that she hit her head a couple times while attempting to go inside her house, so Mr. Harrison carried her inside to the bathroom. Ms. Stout began vomiting inside the bathroom, and appellant held her hair. Ms. Stout said she urinated on herself while vomiting, and Ms. Cate changed her clothing and panties. She did not know what Ms. Cate did with the panties after she changed them. While Ms. Stout was in the bathroom, Mr. Harrison was in the kitchen building a fire, the victim was on the couch, and Ms. Cate left to take Mr. Pollard home.

Ms. Stout testified Ms. Cate called someone named "Sherman" before she left. Appellant heard Ms. Cate talking to Sherman, and appellant asked Ms. Cate to bring him a knife. Appellant told Ms. Cate to tell Sherman "that if Sherman wanted to meet him, he was there." Ms. Stout said she did not view appellant's statements as a threat or challenge toward Sherman.

Ms. Stout said she told appellant that she was cold. Appellant yelled to Mr. Harrison, asking him to shut the door. Ms. Stout said that Mr. Harrison replied, "f[] that door." Appellant got out of the bed and engaged in a "heated argument" with Mr. Harrison. Ms. Cate had returned from taking Mr. Pollard home and told the men that she had opened the door. Appellant told Mr. Harrison and Ms. Cate to leave. Appellant also told them that he had Ms. Stout and Ms. Stout's father's money, and that they could leave and take the victim with them.

Ms. Stout remembered hearing something that sounded like kindling breaking after Ms. Cate and Mr. Harrison had left. Ms. Stout stated an axe was hanging on a wooden plaque on her bedroom wall. She said that sound could have been the axe coming off the wall. She also remembered telling Tennessee Bureau of Investigation ("TBI") Agent Brian Fraley that she heard several loud thumps. Ms. Stout said she heard appellant saying, "you want to play motherf[], we'll play[.]" Ms. Stout was still in her bedroom, and appellant was in the living room. Ms. Stout did not hear the victim say anything. Appellant came into the bedroom, held a knife to Ms. Stout's throat, and asked her if she wanted to die with him because "he had done messed up." Ms. Stout told appellant that he was not going to do anything. Appellant told her that he already "done it" and to "get up." Appellant told Ms. Stout that he killed the victim.

Ms. Stout put on her pants, went in the living room, and ran for the phone. Ms. Stout saw the victim lying on the couch "dying." She said he had head injuries that were bleeding very badly. Ms. Stout called 911. She identified the 911 recording, and the prosecution played it for the court.

Ms. Stout stated that she told Agent Fraley that the knife found outside her house belonged to her son. A few days before the incident, Ms. Stout had argued with her son about the knife, and her son threw the knife off the porch. She said that she retrieved the knife after her son threw it and put in on the table inside her house.

Ms. Stout testified the victim did not make any advances toward her nor did he speak angrily to her that evening. She said the victim did not have any cross words with appellant, and she did not know why appellant would have been mad at the victim.

On cross-examination, Ms. Stout testified that she did not mention appellant during the 911 call or to Officer Owens and Corporal Greer because she had hit her head twice. She said that she did not inform authorities or the paramedics that she had hit her head because she was more concerned about the victim and finding her vehicle.

Ms. Stout admitted stating that she had taken at least ten Valium and Xanax the night of the incident. Ms. Stout said Ms. Cate got cocaine from Mr. Harrison's house on the way back from the Midnight Rodeo. Ms. Cate brought the cocaine to her and told her to snort it because it would help her get sober; however, it did not work. Ms. Stout stated appellant took a Xanax pill and smoked marijuana. Appellant also had some of her drink, which contained vodka. However, Ms. Stout later denied that appellant had passed out from drinking too heavily and said that he only had one beer that night.

Ms. Stout denied cheating on appellant with the victim. She said appellant knew better than to think that she was cheating on him with the victim. Ms. Stout identified her panties that Ms. Cate changed for her. Ms. Stout did not know how the panties got in the living room and said that only Ms. Cate or appellant would know. The TBI compared sperm found on the panties to appellant's and the victim's DNA. Neither man's DNA matched the DNA contained in the sperm. Ms. Stout said that she did not have sex with appellant the night they went to Midnight Rodeo, and the sperm in her panties was from Sherman Biggs. Ms. Stout identified a photograph of stickers that were on her wall at the time of the incident. She said that the stickers had slogans such as "See you when you get here, f[] 'em and forget 'em[,] and high life is my life." Ms. Stout and a friend had drawn around the stickers with crayons. She denied that "f[] 'em and forget 'em" was her mantra.

When asked how her fingerprints got smeared into the blood on the axe, Ms. Stout stated that the axe was on the victim's lap while she was working on him and she might have moved it. She further stated she did not see that the victim's pants were down or that his genitals were exposed while she worked on him. She said she checked around the victim's neck for a pulse. She denied placing the axe on the victim's lap.

Ms. Stout insisted that she did not know the victim before they went to the Midnight Rodeo. She said she had previously seen him with Mr. Harrison and only knew his name. She also denied telling Ms. Cate and Ms. Harrison, and not the victim, to leave so that she could have sex with the victim.

Ms. Stout said she was not afraid of appellant or anyone else. She still loved appellant and said that she would always love him. She communicated with him after the incident but said that she stopped talking to him in January 2010. Ms. Stout said appellant told her that

-10-

"the crime of passion carried 11 years." She told appellant that it was not a crime of passion. She denied telling appellant that she did not speak to police.

Ms. Stout said investigators photographed her hand, and she identified the photograph of her hand. The photograph did not show any blood on her hands, and she said that blood should have been on her fingers. Ms. Stout did not recall whether they swabbed her hands for testing.

On redirect examination, Ms. Stout testified that her statement that the knife was in the yard because her son threw it was more accurate because she made it closer to the incident than her statements at trial. Ms. Stout identified the axe handle, which was bent. She said it was not bent when it was hanging on her wall. Ms. Stout agreed that her fingerprints could have been on the axe handle before the blood because she owned the axe. Ms. Stout said appellant had been to her home several times and saw the slogans on her door. He never told her that he was embarrassed or mad about the slogans.

TBI Special Agent Brian Fraley testified he investigated the crime scene. He arrived at the scene after paramedics removed the victim. As part of the investigation, Agent Fraley sketched the crime scene, and he explained the sketch to the court. Agent Fraley identified photographs of the crime scene and evidence found there.

Agent Fraley said he spoke with Ms. Stout about the knife that investigators found at her home. According to Agent Fraley, Ms. Stout described the knife to him and said one of her sons was playing with it before the incident. Her son got in trouble for having the knife and he threw it in the yard. Ms. Stout did not mention to Agent Fraley that she retrieved the knife and brought it back inside.

Agent Fraley identified appellant and said he spoke with appellant during the investigation. Agent Fraley advised appellant of his rights. Appellant waived his rights and gave a statement to Agent Fraley, which he reduced to writing. Appellant reviewed the written statement and signed it. Agent Fraley read appellant's statement for the jury.

In his statement, appellant said that the group picked him up at his mother's house and they went to the Midnight Rodeo. On the way there, appellant drank two or three beers. While at the Midnight Rodeo, appellant drank two or three more beers and took a Xanax tablet. The group stayed at the Midnight Rodeo until it closed. They drove to Mr. Harrison's trailer, and appellant stayed inside the vehicle while Mr. Harrison went inside for approximately twenty minutes. When Mr. Harrison returned, the group went to Ms. Stout's house. Appellant accompanied Ms. Stout into her bathroom and helped her while she

vomited.  Ms. Stout eventually went into her bedroom, and appellant helped her get into the bed.

Appellant stated that he went into the kitchen and that the victim was in the living room sitting on the couch.  Everyone else was gone.  Appellant said he heard the victim mumbling.  Appellant asked the victim if he was talking to him and the victim replied, "f[] you or something like that."  Appellant went into the living room and said "f[] you."  The victim said "f[] you," stood up, and told appellant that he would kill him.  Appellant stated the victim pulled a knife out of his pocket.  Appellant saw an axe on the table, grabbed it, and hit the victim in the head with it.  The victim fell down on the couch, and appellant hit him "a couple more times while he was on the couch laying down."

Appellant said that he looked down, saw the knife on the floor, and picked it up with his left hand while holding the axe with his right hand.  Ms. Stout came in the living and said "Oh, my God. Oh, my God."  Ms. Stout went to the kitchen and called 911.  Appellant said that Ms. Stout told him to leave before her father arrived.  Appellant ran away with the axe handle and knife still in his hands.  He ran into the woods and threw away the axe and knife. He stayed in the woods for a while before going to a trailer behind Ms. Stout's house and falling asleep.  When he awakened, he saw that no one was inside Ms. Stout's house, and he went inside.  Appellant called his mother, who told him that Deputy David Crowder was at her house.  Appellant talked to Deputy Crowder, who asked appellant to turn himself in. Appellant told Deputy Crowder that he was going to get a ride to the sheriff's department. Instead, appellant obtained a ride to his brother's house.  The girlfriend of appellant's brother called appellant's mother and told her that appellant was there.  Deputy Crowder and other officers arrived, arrested appellant, and transported him to the Jefferson County Sheriff's Department.

In addition to his statement, appellant told Agent Fraley that he sat in the woods behind Ms. Stout's home all day and watched authorities process the crime scene.  Agent Fraley testified that he and Sergeant Coleman searched the woods behind Ms. Stout's house for the axe handle and the knife that appellant said he threw.  Agent Fraley identified a photograph of the axe handle that they found.  He also identified a photograph of the place on the wall where the axes had been hanging in Ms. Stout's room.

On cross-examination, Agent Fraley testified that paramedics had already transported the victim when he arrived at the scene.  Agent Fraley stated that "it was one of the most horrific, bloody crime scenes [he] had ever worked in [his] career."  He said that the house was very small and that the living room was "11 feet six inches on three of the walls, . . . 11 feet five inches on the other wall, with the ceiling height of six feet nine inches."  Agent Fraley stated that the paramedics moved items at the crime scene so they could work on the

victim and might have moved Ms. Stout's panties. Someone had moved the axe when Agent Fraley got to the scene. Agent Fraley said he never found the "fish fillet type of knife" that Ms. Cate said she gave to appellant. He said he found a decorative knife on the dresser in Ms. Stout's bedroom.

Agent Fraley stated that Ms. Stout's house was in disarray, which he expected because the paramedics had worked there. He identified a photograph of a condom wrapper that was next to a shirt on the floor. Agent Fraley said Post-It notes and other items on the floor appeared to have fallen off the coffee table when paramedics moved it.

Agent Fraley explained that investigators took evidence from the crime scene that they believed was relevant. He said the medical examiner was responsible for taking swabs from the victim for DNA testing. Agent Fraley relied on the autopsy report in cases such as this when the victim's body was no longer at the scene when he arrived.

Agent Fraley testified that if he had known about the blood that got on Ms. Stout's hand, he would have tested her hands for residual blood. He said that when he took Ms. Stout's statement, she did not tell him that appellant put a knife to her throat. He did not see or hear about the photographs of Ms. Stout's neck.

Agent Fraley testified he disagreed with appellant's assertion of self-defense. He said there was "no way [the victim], with his pants down, and things of that nature, . . . could have get [sic] up off that couch and tried to attack [appellant.]" Agent Fraley did not include appellant's watching authorities process the crime scene in appellant's written statement because appellant mentioned it after he had already signed his written statement. Agent Fraley stated he would have noted the additional comments if they pertained to the actual crime.

On redirect examination, Agent Fraley testified that because that couch was close to where the axes were hanging, appellant only had to advance two or three steps to hit the victim. He said the photograph of a condom wrapper may have been an unused condom in its wrapper. He further said that if there had been a used condom at the crime scene, he would have taken it as evidence. Agent Fraley stated that he was not sure that it was a condom wrapper in the photograph and agreed that it could have been "Wet Wipes or something." There were no less than six people in Ms. Stout's house that night, and Agent Fraley said the wrapper could have fallen out of any of their pockets.

Detective Ronnie Coleman, Chief Detective of the Jefferson County Sheriff's Department, testified that he investigated the crime scene in this case. When he arrived, paramedics had already transferred the victim. He said that the room "was pretty much just

a blood scene with [blood] all over the wall, the ceiling, the couch, [and] the floor." He also said that brain matter or flesh was on the curtain beside the couch and that the room was in disarray. Detective Coleman photographed the crime scene. He identified a photograph he took of blood spatters on the wall and a pillow and couch with blood stains. The State marked the photographs as exhibits and published them to the jury.

Detective Coleman catalogued the evidence in the case. He took a gray shirt, an axe head, and women's panties into evidence and sent them to the TBI for testing. The TBI test reports showed that the victim's blood and Ms. Stout's finger prints were on the axe head. Detective Coleman also took appellant's pants into evidence. The TBI tested what appeared to be blood stains on the pants and determined that it was the victim's blood.

Detective Coleman said he video recorded the crime scene. He identified the videotape, and the State played it for the jury. Detective Coleman said the only indication that appellant struck anything else in the house with the axe was a cut mark on the upper part of the back of the couch. He did not see any axe marks on the wall or any other furniture.

On cross-examination, Detective Coleman testified he did not take photographs of Ms. Stout's throat and did not know whether such photographs existed. Detective Coleman stated the paramedics could have caused "smudge marks" on the wall at the scene. He said the TBI reports showed that Ms. Stout's fingerprints were on the blade part of the axe.

Deputy Robert Morgan with the Jefferson County Sheriff's Department testified that he spoke with appellant on January 30, 2007. Appellant asked Deputy Morgan "what they would give him," and Deputy Morgan told appellant that he could not answer his question because he was not a judge or jury. Appellant then told Deputy Morgan that "they should give him the death penalty because he took another man's life[.]"

Paulette Sutton, a private forensics consultant, testified that she specialized in blood stain pattern analysis. She reviewed the evidence in this case and reported her findings. One of her findings was about a gray shirt that had "Brushy Mountain Correctional Complex" written on it. Ms. Sutton said the shirt had blood spatter on the front of the shirt and on one arm. She explained that the spatters on the sleeve showed a force or blow that caused them. Ms. Sutton stated the size of the blood spatters on the sleeve and front of the shirt were consistent with a beating or stabbing. A photograph of the crime scene showed the shirt on the floor. Ms. Sutton testified that "[i]n order for all of those spatters to be on the shirt, if the shirt were lying in [sic] the floor at the time those spatters hit it, then [she] should [have seen] similar spatters in the area around it[.]" She further testified that

the spatters are not on the floor. We know that the spatters, to get on the shirt, the shirt [had] . . . to be in the vicinity of this kind of an assault. It's not on the floor. There's spatters on the front, there's spatters on the sleeve. There's not spatters on the back. So all of that . . . says that it's consistent with the shirt being worn at the time that the spatters impacted the shirt.

Ms. Sutton stated the blood spatter was consistent with an injury inflicted by an axe. She further stated the photographs showed that the victim was lying on the end of the couch when appellant inflicted the injuries. She said the photographs showed an area void of blood that was consistent with the shape of a pillow that was at the scene. Ms. Sutton agreed that it appeared that the victim was lying on the couch with his head on the pillow.

On cross-examination, Ms. Sutton testified that the person who exerted the energy to create the blood spatter does not necessarily have to be the person who received the spatter stains. She said that once created, the spatters hit anything in their vicinity. According to Ms. Sutton, spatter from this type of event could travel ten feet or more. She stated that in examining the pool of blood that was on the ground, it appeared that the victim's head had to have been off the couch some distance, but she could not tell exactly how far.

On redirect examination, Ms. Sutton testified the blood pooling on the floor could have occurred while paramedics were treating the victim. She stated that the axe handle could have caused the blood spatter because impacts cause spatter regardless of the type of object used.

Dr. Darinka Mileusnic-Polchan, the chief medical examiner for Knox and Anderson Counties, consulted on the victim's autopsy and stated that the victim's cause of death was multiple sharp and blunt force trauma. She said that doctors performed a toxicology report on the victim that showed that the victim had a blood alcohol level of .07. She further said that a drug screen showed Atropine present in the victim's system. She explained that Atropine was a common medication given during resuscitation attempts.

Dr. Mileusnic-Polchan testified that the sharp force trauma to the victim consisted of two main "chopping" injuries on the back of his head. One injury was "about 4.2 inches long, letter C-shape, and essentially shaved the scalp all the way to the bone." This injury was a very deep injury that undermined the scalp, but it did not penetrate the bone. The other major sharp force injury was right above the first injury. Dr. Mileusnic-Polchan explained that "[i]t was almost kind of crescent shaped. That was the devastating injury that went through the skull all the way through bone fragment and bone extensively and then cut[] through the coverings of the brain and went into the brain." She said that this injury was 5.7

inches long and essentially severed the front and back parts of the left hemisphere into two halves.

Dr. Mileusnic-Polchan identified a photograph of the injuries to the back of the victim's head and explained them to the jury. The photograph showed sharp force injuries and blunt force trauma. Dr. Mileusnic-Polchan stated that she initially thought that different instruments caused the sharp and blunt force trauma. She further stated that it was the same weapon in a different condition because the blade had detached. She reviewed a photograph of the axe and said that it was consistent with a weapon that could cause sharp force trauma.

Dr. Mileusnic-Polchan identified a photograph of the victim's injuries caused by blunt force trauma. The photograph showed lacerations to the victim's hairline and above the victim's right eye. A laceration caused the victim's scalp to burst. This laceration had a pattern of abrasion around it, which meant that an elongated object was hitting and splitting the skull. The photograph also showed superficial bruising on the victim. Another photograph of blunt force trauma showed that an elongated object rather than a sharp blade made "train track like injuries." The elongated object hit the victim's face at least five times. She stated these injuries were consistent with the axe handle striking the victim's face.

Dr. Mileusnic-Polchan identified a photograph that showed a "very[,] very irregular injury." She explained that the injury was not a "clear-cut chopping injury . . . . Only one corner [was] sharp, but everything else [had] very ragged, very irregular undermined margins that actually resemble[d] lacerations. Meaning that it's a bursting pattern of the injury." Dr. Mileusnic-Polchan explained that the appearance of irregular lacerations depended on the type of weapon used. She said that the victim's injuries moved from cuts, to combinations of cuts and lacerations, to just lacerations because the axe blade was loose and falling apart. She stated that "[t]he blade essentially, maybe, kind of touches it and then just falls off and then the rest of the weapon now, being just the handle, is going to finish tearing the skin that already started to tear or cut." She explained that the pure blunt force trauma was consistent with the axe handle being used.

Dr. Mileusnic-Polchan identified a photograph of the victim's right hand, which had superficial abrasions along interphalangeal joints, swelling, and bruising. She testified the injury could be consistent with the victim's trying to protect his head from being hit. Dr. Mileusnic-Polchan identified a photograph of the victim's right wrist area. The area contained two injuries, one of which was from blunt trauma.

Dr. Mileusnic-Polchan stated the victim sustained at least twelve blows to his head. Two of the blows were "clear-cut chopping" injuries. Dr. Mileusnic-Polchan testified that "the first blows [were] the chopping injuries because that's the only time when we have the

blades positioned at the end of a handle . . . . From that point on, obviously, the handle [was] falling off and that's why everything that follows is in the blunt trauma." Dr. Mileusnic-Polchan marked a model head with the location of the blows.

Based on the crime scene photographs, Dr. Mileusnic-Polchan testified that the victim was on the couch with his head hanging off the couch when he received the injuries. She stated that the injuries were not "immediately deadly" and would not necessarily have caused the victim to lose consciousness. She further stated that the victim would have had pain and disorientation but would not have been immediately disabled. Dr. Mileusnic-Polchan said it was possible that the victim could have been turning and his head was not on the couch. According to Dr. Mileusnic-Polchan, the injuries sustained by the victim were beyond those necessary to cause death, and the injury to the brain alone would have eventually caused death.

In preparation for her testimony, Dr. Mileusnic-Polchan reviewed appellant's statement that explained his version of the events. She stated appellant's assertion of self-defense was inconsistent with the victim's injuries. She further stated that inflicting the injuries on the back of the victim's head in a standing position would have been extremely difficult if the men were facing each other. Dr. Mileusnic-Polchan said that there would not have been room for an axe that was at least two feet long to strike the victim, who was 5'9" in height, because when he stood the ceiling would have been only one foot above the victim's head. However, she said that inflicting the injuries would have been possible if the victim were lying on the couch.

On cross-examination, Dr. Mileusnic-Polchan testified that because the victim's blood alcohol level was .07, he was not presumed intoxicated. From what she reviewed, Dr. Mileusnic-Polchan could not detect whether the victim was awake when appellant first struck him.

On redirect examination, Dr. Mileusnic-Polchan testified that because the victim's body was completely on the couch, it was likely that he was on the couch initially because "collapsing on the sofa [in] such a perfect position, would be relatively hard and . . . with the concentration of the blood spatter that . . . was mainly present, it would position the body in the corner of the room to begin with[.]"

Following Dr. Mileusnic-Polchan's testimony, the State rested its case. Appellant did not present any proof. After hearing the evidence, the jury convicted appellant of first degree murder.

*Sentencing Hearing*

The trial court held a sentencing hearing on August 13, 2010. At the sentencing hearing Terry Marion, the victim's father, testified that the victim's death had been the "hardest most tragic thing [his family] had to go through." He stated that appellant could have stopped what he did to the victim and that what appellant did to the victim was inhumane. He said that his biggest fear was "if [appellant] gets out, whose family is going to be next, what's the next poor man that is going to get slaughtered, done the way that he did."

Pauline Marion, the victim's mother, testified that the victim's death broke her heart. She said that she forgave appellant, which was the hardest thing she has ever had to do, but that she would never forget the brutal way that appellant murdered her son. Ms. Marion hoped and prayed that appellant would be "put away in a place to where [he] could never ever do this to another person or another family." She expressed sympathy toward appellant's family and stated that appellant "has not hurt one family but he's hurt two."

Vicki Gibbs, the victim's wife, testified that the victim's murder had been horrible for everybody in their family, particularly their children. She stated that she had to watch their children grow and want their father every day and that she could not give them their father. She further stated that "[a]t least [appellant]'s kids will get to write him, they'll see him from time to time, they'll know he's alive." She explained that the victim's children had to go to their father's grave in Kentucky to see him. Ms. Gibbs said that she and the victim's daughters were "daddy's girls" and that she could not fill that void for them. She said that her family would never get over the victim's murder. She stated that she felt sorry for appellant's family, but that appellant "did a brutal crime, and he didn't care about his kids or [their] kids whenever [sic] he did this." She further stated that she did not think appellant "deserved to ever be out."

Appellant testified that he had a previous conviction for driving under the influence. He stated that he and Ms. Stout's relationship had been rocky. He claimed that he had tried to separate from Ms. Stout but "she kept running [him] down." He stated that he had gotten into several fights and got "jumped" at her house "for trying to just love" Ms. Stout.

Appellant had left Ms. Stout because "she wasn't no [sic] good woman" and moved in with another woman. He said that the other woman was a "good girl" who had a "good head on her shoulders" but that he still loved Ms. Stout. On December 25, 2006, Ms. Stout went to the home of appellant and his new girlfriend. She left a note at their house stating that she and appellant were married and had two children. Appellant said he and Ms. Stout were not married, and they did not have any children together. Because of Ms. Stout's note,

he and his new girlfriend separated. She kicked him out of her house, and he went to live with his mother.

Appellant stated that Ms. Stout attempted to reconcile with him. Appellant said that on January 27, 2007, he had been stressed because he was unemployed and his bills were past due. Appellant was also worried about going back to jail. He smoked marijuana that day to try to relax. Ms. Stout called him that night and asked him if he wanted to go out to eat and get drinks. He said that he did and "next thing he knew," Ms. Stout was at his house with people whom he hardly knew. He stated that he knew Mr. Harrison, Mr. Pollard, and Ms. Cate but that he did not know the victim. Appellant left his pistol with his brother, got some money, and went outside.

The group was crowded in the vehicle, and appellant offered to drive Ms. Stout in his truck. Appellant said that the group convinced him to ride in the vehicle, and they drove to the Midnight Rodeo. On the way, the group was drinking whiskey from the bottle and smoking marijuana. Once at the Midnight Rodeo, they continued to drink. Appellant took a Xanax tablet at the Midnight Rodeo.

According to appellant, Ms. Stout was dancing with Mr. Harrison at the Midnight Rodeo. Appellant said it upset him because he and Ms. Stout had a rocky relationship and she had "messed around with two or three men." He said that Ms. Stout came over to him and that he talked to her about dancing with Mr. Harrison. He further said that Ms. Stout got upset with him and that they argued about her dancing with Mr. Harrison. Appellant told Ms. Stout that her dancing with another man when she brought appellant to the bar was not right. He said Ms. Stout was "just falling down sloppy drunk."

Appellant said he was an alcoholic and a drug addict. He took a glass from Ms. Stout because she was falling down and about to spill it. He drank the drink and said that he tasted something chalky. Appellant said that approximately ten minutes later, he began feeling "real strange." He said that it was "like a movie picture where the movie cuts in and out and you start just losing like consciousness . . . [.]"

Appellant recalled leaving the Midnight Rodeo. On the way home, Ms. Stout started to get sick to they pulled over so she could vomit. Ms. Stout went to a ditch to vomit and fell in the ditch. Appellant tried to help her but fell and hurt his rib. He got up and helped Ms. Stout back into the vehicle. The group went to Mr. Harrison's house. Appellant did not remember what happened at Mr. Harrison's house.

The group left Mr. Harrison's house and went to Ms. Stout's house. Appellant recalled that he and Mr. Harrison helped Ms. Stout into the bathroom. He said that Ms. Stout

was very sick, and he helped her while she was in the bathroom. Appellant heard the group in the living room saying that they had to get appellant out of the house before Mr. Messer, Ms. Stout's father, arrived. Appellant said that he told them, "I've got Bobby's money. I'm going to pay him his money. I'm not going to leave. I'm going to face that man." Appellant said that somebody had left the door to the house open and that Ms. Stout's dogs were running in and out of the bathroom. Appellant yelled "shut the f[]ing door." He said that it was at least twenty-eight degrees and that Ms. Stout was "freezing to death."

Appellant recalled going into the bedroom with Ms. Stout. He said that they lay in the bed together. Appellant said that he was "just messed up" and "out" for a couple minutes until Ms. Stout bumped the bed. He noticed Ms. Stout was not wearing any pants. Appellant got up to go to the bathroom and noticed that the victim was lying on the couch with his pants down. Appellant stated that his "ears got hot" and that he felt his "blood just boiling." He further stated that he could "feel like laughter, and . . . [he] could hear [Ms. Stout] moaning in [his] ear, imagining what had took [sic] place."

Appellant testified that he did not remember grabbing the axe. He remembered standing in the living room with the handle in his hand. Ms. Stout came out of the bedroom pulling up her pants and said, "[O]h, my God. Oh, my God." Appellant said "Oh, my God, what have I done." He stated that he checked the victim's pulse to make sure that he was still alive. Ms. Stout got the phone and told appellant to leave. Appellant said that he was only wearing pants, and he did not have a ride or anywhere to go. Appellant ran to the woods surrounding Ms. Stout's house, threw the axe handle in the woods, and stayed in the woods for about two hours. When he heard sirens, appellant went to a trailer directly behind Ms. Stout's house. He said he sat in the trailer and waited for authorities to apprehend him, but they never did.

Appellant testified that he wanted to confront what he did. He spoke to a friend and told him that he thought he killed the victim. His friend told him to say that it was self-defense. Appellant told his friend that he would probably spend the rest of his life in prison. Appellant thought that claiming self-defense was the best thing.

Appellant went to Ms. Stout's house and called his mother at work. Appellant said that his mother's employer told him the police were at his mother's house looking for him. Appellant called his mother's house and spoke with Officer Crowder. Appellant turned himself into Officer Crowder that day.

Appellant said he regretted what happened and wished he could give the victim's parents back their son. He said that whether he spent the rest of his life in prison or was

released he had to live with what he did. He further said he did not intentionally kill the victim and apologized for what he did.

Appellant thought Ms. Stout and the victim were sleeping together. He said he was sick of Ms. Stout "messing around" on him. He further said that he "couldn't have no [sic] normal life without [Ms. Stout] coming and chasing [him] down, calling threatening [him][.]" According to appellant, Ms. Stout would not let him move on with his life. He stated that he wanted "something solid in life" and could not help that he fell in love with somebody like Ms. Stout.

On cross-examination, appellant testified that he did not remember using the axe to kill the victim, but he did not deny that he did. He said that he lied when he told Ms. Stout that the victim attacked him and he defended himself. Appellant stated that he did not tell Ms. Stout that he was going to claim a crime of passion instead of self-defense. He denied being aware that Ms. Stout was involved with Sherman Biggs and denied asking Ms. Cate to bring him a knife.

Joey Thomas Sutton, appellant's brother, testified that appellant was a "good-hearted man." He said that appellant would rather be a man's friend than to do harm to him. He said that what happened tore his family's world apart. Mr. Sutton said that he was sorry for the victim's family, but he knew in his heart that appellant did not intentionally kill the victim. He said that appellant truly loved Ms. Stout. Mr. Sutton introduced appellant to Ms. Stout and said that he "beat [him]self up over that every day."

After hearing the evidence and deliberating, the jury sentenced appellant to life without the possibility of parole. Appellant filed a motion for new trial. After a hearing, the trial court denied the motion for new trial. A timely notice of appeal followed. On appeal, appellant argues that (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred when it admitted certain autopsy photographs; (3) emotional displays from the victim's family violated his right to a fair trial; (4) the evidence did not support the jury's finding of a sentence of life without parole; (5) the State's victim impact evidence was improper; and (6) the trial judge did not follow proper procedure when removing alternate jurors.

## II. Analysis

### *Sufficiency of the Evidence*

On appeal, appellant argues that the evidence was insufficient to sustain his conviction. Specifically, he argues that the evidence did not support the finding of

premeditation and intent. Further, he argues that the evidence of voluntary intoxication prevented the finding of premeditation and intent thus, the jury should have convicted him of a lesser-included offense. The State responds that the evidence was sufficient to support a conviction for first degree murder. We agree with the State.

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded by statute as stated in State v. Blanton*, 926 S.W.2d 953, 958 n.6 (Tenn. Crim. App. 1996). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction "'removes the presumption of innocence'" that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (quoting *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The jury convicted appellant of first degree murder. As applicable to appellant's case, Tennessee Code Annotated section states 39-13-202(a)(1) states that first degree murder is the "premeditated and intentional killing of another."

"[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202 (d) (2006). "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Tenn. Code Ann. § 39-11-106 (a)(18) (2006). In reviewing the sufficiency of the evidence, we must determine whether the State established the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). The presence of premeditation is a question of fact for the jury, and the jury may infer premeditation from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

A defendant's "state of mind is crucial to the establishment of the elements of the offense," thus, the State may prove premeditation by circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Several factors support the existence of premeditation including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *Brown*, 836 S.W.2d at 541-42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)).

Viewed in the light most favorable to the State, the evidence was sufficient to show the necessary premeditation and intent to support appellant's conviction for first degree murder. Here, appellant used an axe on the unarmed victim. The trial testimony was consistent. The victim was either passed out or asleep on Ms. Stout's couch after returning from the Midnight Rodeo. The victim did not provoke appellant in any way. When the other people left, the uninjured victim was still asleep on the couch, and the axe was hanging on Ms. Stout's wall. Ms. Stout and appellant were the only people in the house with the victim. Ms. Stout heard something that sounded like breaking kindling and later believed it was the sound of appellant taking the axe off her wall. Ms. Stout heard appellant say "You want to play motherf [], we'll play." The medical testimony showed that the victim was lying on the couch when appellant attacked him. Appellant struck the victim at least twelve times with the axe and continued to strike him after the axe broke. Dr. Mileusnic-Polchan testified that the

-23-

injuries were beyond that necessary to kill the victim. After attacking the victim, appellant went to a trailer behind Ms. Stout's house and slept. The evidence clearly showed that appellant used a deadly weapon upon the sleeping, unarmed, victim; the axe murder was particularly cruel; and appellant was calm enough to fall asleep in a trailer behind the crime scene immediately after the killing. Thus, we find that the evidence was sufficient to show premeditation and intent.

Appellant further argues that he was unable to premeditate and form the intent to kill because he was voluntarily intoxicated when he killed the victim. Although the intoxication of a defendant does not justify the crime, its existence may negate a finding of specific intent. *State v. Bullington*, 532 S.W.2d 556, 560 (Tenn. 1976); *see* Tenn. Code Ann. §39-11-503(a) (2006) "[I]f the voluntary drunkenness of the accused exists to such an extent that he is incapable of forming a premeditated and deliberate design to kill, he cannot be guilty of murder in the first degree." *Bullington*, 532 S.W.2d at 560 (citing *Mullendore v. State*, 191 S.W.2d 149, 151 (1945), *overruled on other grounds by State v. Buggs*, 995 S.W.2d 102 (Tenn. 1999)). A jury may consider a defendant's state of intoxication in conjunction with all other facts of the case to determine whether the murder was premeditated or resulted from passion excited by inadequate provocation even if the defendant's intoxication was not sufficient to render him totally incapable of premeditation. *Id*. at 560-61 (citing *Cartwright v. State*, 76 Tenn. 376, 384-85 (1881); *Lancaster v. State*, 70 Tenn. 575, 578 (1879); *Haile v. State*, 30 Tenn. 154, 157 (1850)).

We are not persuaded by appellant's claims that intoxication rendered him unable to form the culpable mental state. The jury heard evidence that appellant and the rest of the group engaged in a night of drinking and drug use shortly before the murder. Appellant has not included the jury charge from the guilt phase in the record on appeal. Because the record does not contain the jury charge, we must presume that the trial court properly instructed the jury on voluntary intoxication. *See State v. Earl Jones*, No. 02C01-9206-CR-00127, 1993 WL 194029, at *1 (Tenn. Crim. App. June 9, 1993) ("We must . . . presume the trial court's instruction to be correct in the absence of an adequate record."). By convicting appellant, the jury obviously did not find that his voluntary intoxication negated his specific intent to commit first degree murder.

As stated above, the trier of fact determines the credibility of the witnesses, any issues of fact, and the weight to be given the evidence presented at trial. *Bland*, 958 S.W.2d at 659. By its guilty verdict, the jury clearly found that appellant acted both intentionally and with premeditation when he attacked the victim with an axe. We conclude that appellant is not entitled to relief on this issue.

Next, appellant argues that the trial court should have restricted the State's admission of autopsy photographs because the prejudicial effect of the photographs substantially outweighed the probative value.

Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of the photographs. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). First, a witness with knowledge of the facts must verify and authenticate a photograph before it can be admitted into evidence. *Id.* at 949. Next, a trial court must determine whether the photograph is relevant. *Id.*; *see* Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. If the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," it is relevant. Tenn. R. Evid. 401. Once it determines that a photograph is relevant, the trial court must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403 Advisory Comm. Cmts.). "A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions." *State v. Leach*, 148 S.W.3d 42, 63 (Tenn. 2004) (citing *Banks*, 564 S.W.2d at 951).

The decision whether to admit the photographs rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see State v. Stinnet*, 958 S.W.2d 329, 331 (Tenn. 1997); *State v. Dubose*, 953 S.W.2d 649, 653 (Tenn. 1997). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at 949. Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. *Id.* "Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Derek Williamson*, No. M2010-01067-CCA-R3CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)), *perm. app denied*, (Tenn. Dec. 14, 2011).

The State asked to display a photograph of the victim that Detective Coleman took at the scene, and the court called counsel to the bench. Outside the hearing of the jury, the trial judge asked the State whether they had photos of obvious brain matter. The State said one showed a "blob" hanging from the curtain. The State showed the court the photographs that it intended to introduce through Detective Coleman. The court ruled that photographs 2, 3, 4, 7, and 108 were inadmissible.

During his testimony, the State asked Officer Owens to identify a photograph of the victim. The defense objected to the photograph because the danger of unfair prejudice substantially outweighed its probative value. The court noted that the State had not laid a proper foundation for Officer Owens to identify the victim in the photograph. Upon further questioning from the State, Officer Owens stated that most of the victim's injuries were on the top right of his face. Officer Owens identified a photograph of the victim and said that it fairly and accurately represented the victim's injuries. The court admitted the photograph into evidence.

During Dr. Mileusnic-Polchan's testimony, the trial court recessed to review photographs that the State wanted to admit through Dr. Mileusnic-Polchan. Appellant objected to a photograph that showed a deep gash in the victim's forehead. The trial court ruled that "assuming that the appropriate foundation is laid by the expert witness in connection with her testimony, . . . the probative value of this particular photograph does outweigh[1] any danger of unfair prejudice to the defendant." Appellant also objected to a photograph that showed the gash on the victim's forehead and wounds to the side of his face. The State intended to use this photograph to show that appellant struck the victim with the axe handle after the axe had fallen apart. The court ruled that if the expert witness laid the appropriate foundation to support the State's theory regarding the repeated and continuing attack on the victim, then the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice.

Appellant specifically objected to Exhibit 1, which was the autopsy photograph of the victim. The trial court found that it was highly probative of the victim's condition when Officer Owens observed him and allowed it into evidence. Appellant also objected to exhibit 39, which was a photograph of a deep gash in victim's forehead with matter inside the wound. The trial court found that it was probative to show the continuing nature of the attack of the victim even after the axe handle came loose. The court further found that the probative value

---

[1] We note that the trial court did not properly articulate the admissibility test stated in Rule 403 of the Tennessee Rules of Evidence. Viewing the record as a whole, it appears that the trial judge misspoke. Notwithstanding, we conclude that any error was harmless, and the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403

was not substantially outweighed by the danger of unfair prejudice. Appellant also specifically objected to exhibit 37, the photograph that showed a gash on top of the head with flesh or brain matter. The trial court found that this photograph was also probative to show the continuing nature of the attack of the victim even after the handle came loose and that the probative value was not substantially outweighed by the danger of unfair prejudice. Appellant did not make particular objections to the remaining photographs that the court admitted, but the trial court found that their probative values were not substantially outweighed by the danger of unfair prejudice to appellant.

In the present case, the trial court conducted a jury-out hearing to determine the admissibility of the photographs. The court carefully examined the photographs offered by the State. The trial judge commented about the proffered photographs and made cogent findings regarding their probative values versus their prejudicial effects. We hold that the trial court did not abuse its discretion in admitting the contested photographs. This issue is without merit.

*Fair Trial*

For his third issue, appellant contends that "the trial judge should have examined the jury to determine whether their ability to be fair and impartial was impacted by the emotional reaction of [the victim]'s mother to the autopsy photographs being shown during the testimony of Dr. Mileusnic[-Polchan]." The State responds that appellant did not ask for a jury poll at trial, nor did appellant move for a mistrial, thus, he has waived the issue by failing to seek a curative instruction or action. Again, we agree with the State.

During Dr. Mileusnic-Polchan's testimony, defense counsel objected, outside the jury's hearing, to the victim's mother crying during the testimony. The record shows the following jury-out colloquy between counsel and the court:

>   [Defense counsel]: Your Honor, approach? . . .
>
>       . . . .
>
>   For the purposes of the record, the jury is staring right at the victim[']s - I assume that's [the victim's] mother who's throwing herself into almost the floor in hysterics crying over these photographs and the jurors keep looking at her.
>
>   [The State]: Your Honor, I don't think she's doing anything that any mother wouldn't do. I don't think there's any acting or anything of that nature.

-27-

She is reacting to the photographs and she's just seeing what this defendant has done to her son.

[Defense counsel]: I know Your Honor understands why I have to make

The Court: Well, it's true, but I don't know what you're asking me to do?

[Defense counsel]: I don't know if she needs a moment so that we can continue without her proceeding to be further disruptive.

[The State]: She appears to be leaving the courtroom at this time. The only photographs that are left are the two that show the injuries on the hands. I don't believe there will be anything else on the big screen.

The Court: I don't think to - but I think if I do anything, it will call attention to it.

[Defense counsel]: Well, at this point, if she wasn't leaving the courtroom, I was going to ask maybe the Court to consider a break for her to calm down and/or - because it's becoming more that the focus is on her as opposed to the proof.

The Court: She's leaving the courtroom at this time. The Court is going to instruct the court officers to just -

[Defense counsel]: Keep her maybe out there till it's over?

The Court: -- well, no, I'm not asking them to do that, but she has a right to be in here. But then, again, for the record, she was weeping, but -

[Defense counsel]: Right.

The Court: -- but it wasn't hysterically. And the jurors, I was watching the jurors, as - and, of course, the Court noticed that she was crying -

[Defense counsel]: Right.

The Court: -- but I was watching the jurors and they were focused on the proof, paying very close attention to Dr. Mileusnic[-Polchan].

-28-

[Defense counsel]: Okay. Thank You.

Appellant asked the court to take a break so that the victim's mother could calm down; however, the victim's mother left the courtroom on her own. Appellant did not ask the court to examine the jury, give a curative jury instruction, or declare a mistrial. Thus, appellant failed to take any reasonable action to "prevent or nullify" the alleged error. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Moreover, the trial court observed that the victim's mother was weeping and not crying hysterically. The trial court stated that the jurors were "focused on the proof" and paying "very close attention to Dr. Mileusnic[-Polchan]." Thus, there was no harmful effect or prejudice to appellant. Appellant is not entitled to relief on this issue.

*Sentence*

Appellant further argues that the evidence does not support the imposition of a sentence of life without the possibility of parole. Specifically, he claims that because a combination of twelve blows caused the victim's death and because the victim was sleeping or passed out when appellant attacked him, the murder was not "especially heinous, atrocious, or cruel, in that it involved torture of serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (2006).

> In any first degree murder case in which the state does not seek the death penalty, but is seeking imprisonment for life without the possibility of parole as the maximum punishment, should the jury find the defendant guilty of first degree murder, the jury shall fix the punishment in a separate sentencing proceeding, to determine whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or imprisonment for life.

Tenn. Code Ann. § 39-13-207(a) (2006). At the sentencing proceeding, the parties may present evidence as to any matter that the court deems relevant to the punishment, including, but not be limited to: (1) the nature and circumstances of the crime; (2) the defendant's character, background history, and physical condition; (3) any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and (4) any evidence tending to establish or rebut any mitigating factors. Tenn. Code Ann. § 39-13-204(c) (2006). If the jury unanimously determines that the State proved at least one statutory aggravating circumstance, "the jury shall, in its discretion, sentence the defendant to either imprisonment for life without the possibility of parole or to imprisonment for life." *Id*. § 39-13-207(c). In exercising its discretion, the jury is required to "weigh and consider the statutory aggravating circumstance or circumstances proven by the [S]tate beyond a reasonable doubt and any

-29-

mitigating circumstance or circumstances." *Id.* § 39-13-207(d). Likewise, on review, this court shall consider a sentence of imprisonment for life without parole appropriate "if the [S]tate proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." *Id*. § 39-13-207(g).

Here, the jury found that the State established aggravating circumstance (5) under Tennessee Code Annotated section 39-13-204 beyond a reasonable doubt. Under this circumstance, the jury considers whether "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death[.]" Our supreme court has defined torture as the"infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985). Regarding serious physical abuse beyond that necessary to produce death, our supreme court has explained that serious alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be beyond that or more than what is "necessary to produce death." *State v. Odom*, 928 S.W.2d 18, 26 (Tenn. 1996) (internal quotations omitted). "The (i)(5) aggravating circumstance may be applied if the evidence is sufficient to support *either* torture *or* serious physical abuse beyond that necessary to produce death." *State v. Rollins*, 188 S.W.3d 553, 572 (Tenn. 2006) (citing *Suttles*, 30 S.W.3d at 262).

The evidence supports the jury's finding of the existence of the "heinous, atrocious, or cruel" murder. Dr. Mileusnic-Polchan's testimony showed that the victim sustained two sharp force trauma injuries on the back of his head. She testified that one of the sharp force traumas was "a devastating injury that went through the skull all the way through bone fragment and bone extensively and then cuts through the coverings of the brain and went into the brain." Dr. Mileusnic-Polchan testified that the injury to the brain would have eventually caused death and that the other injuries sustained by the victim were beyond those necessary to cause death. Despite inflicting the devastating injury that penetrated the victim's skull, appellant continued to inflict multiple injuries on the victim. Dr. Mileusnic-Polchan further stated that the victim would have experienced pain and disorientation, but would not have been immediately disabled. Regarding appellant's assertion that the victim was asleep or passed out throughout the attack, Dr. Mileusnic-Polchan identified a photograph of the victim's right hand, which had superficial abrasions consistent with the victim being awake and trying to protect his head from being hit. Thus, we conclude that the jury properly imposed a sentence of life without the possibility of parole based on the enhancement factor that "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death[.]" Tenn. Code Ann. § 39-13-204(i)(5) (2006). Appellant is not entitled to relief on this issue.

*Victim Impact Evidence*

Appellant next argues that the introduction of improper victim impact evidence was plain error, and this court should reduce his sentence. The State responds that the victim impact evidence did not rise to the level of plain error. We agree that the record does not support a finding of plain error.

"Victim impact evidence and argument during sentencing are not prohibited by the constitution or statute." *State v. Tony Carruthers*, No. W1997-00097-CCA-R3-CD, 1999 WL 1530153, at *48 (Tenn. Crim. App. Dec. 21, 1999) (citing *State v. Nesbit*, 978 S.W.2d 872, 890 (Tenn. 1998)), *aff'd in part, rev'd in part*, 35 S.W.3d 516 (Tenn. 2000). However, the introduction of victim impact evidence is not unrestricted. *State v. Berry*, 141 S.W.3d 549, 589 (Tenn. 2004). The evidence must be relevant to the specific harm to the victim's family. *State v. Middlebrooks*, 995 S.W.2d 550, 558 (Tenn. 1999). The evidence must also be limited to "information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." *Nesbit*, 978 S.W.2d at 891 (footnote omitted). "[C]haracterizations and opinions about the crime, the defendant, and the appropriate sentence" by the victim's family members violate the Eighth Amendment. *Id*. at 888 n.8.

Appellant complains that the State introduced improper victim impact testimony from the victim's father, mother, and wife. Specifically, he takes exception to the victim's father's statement, "I'm begging you, don't let him do it to somebody else"; the victim's mother's statement, "I hope and pray you are put away in a place to where you could never ever do this to another person or another family"; and the victim's wife statement, "I don't think he should deserve to ever be out." Citing *Nesbit*, appellant contends that these statements were beyond admissible victim impact evidence and created an unwarranted emotional impact on the jury.

Appellant has waived any challenge regarding the victim impact testimony about which he complains because he failed to make a contemporaneous objection. Tenn. R. App. P. 36(a). However, this court may exercise plain error review when a party fails to make an objection at trial. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000); Tenn. R. App. P. 36(b). When deciding whether an error constitutes "plain error" in the absence of an objection at trial, this court considers the following: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" *Smith*, 24 S.W.3d at 283 (quoting *State v. Adkisson*, 899

S.W.2d 626, 641 (Tenn. Crim. App. 1994)); *see also* Tenn. R. Crim. P. 36(b). The record must establish the presence of all five factors before we will recognize the existence of plain error. *Smith*, 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* Moreover, the plain error must have been "'of such a great magnitude that it probably changed the outcome of the trial.'" *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley,* 838 F.2d 932, 937 (7th Cir. 1988)).

The victim's father's, mother's, and wife's statements went beyond testimony designed to provide a glimpse into the life of the victim, the circumstances surrounding the victim's death, and how those circumstances affected members of the victim's family. However, considering the strong evidence admitted in support of the aggravating circumstance upheld in this case, the three short victim impact statements were harmless. The statements were not inflammatory and did not render the proceedings fundamentally unfair or unduly prejudicial to the appellant. Thus, we conclude that consideration of the error is not necessary to do substantial justice and thus plain error review is unwarranted. Appellant is not entitled to relief on this issue.

*Alternate Juror Removal*

Finally, appellant argues that "the record contains no information concerning the selection of alternate jurors." Appellant posits that "[b]ecause there is no information in this record concerning the method of alternate jury selection and because the defendant was sentenced to life without parole, the [appellant] submits that the State should have been required to set forth the manner of jury selection in the record or required to have specific statements concerning the manner and selection of the alternate jurors at the motion for new trial." In his motion for new trial, appellant asserted that a "more consistent and random means of ascertaining who [are] the alternate [jurors] should be devised. In this case at hand the very two jurors who [were] held on behalf of the Defense in appearance were struck. Said exclusion deeply hurt [appellant's] chance at a not guilty conviction on First Degree murder." From this, we glean that appellant is asserting that he is entitled to relief because the record does not reflect the trial court's method of selecting the alternate jurors.

Appellant has not cited any authority on this issue, thus, we conclude that appellant has waived this issue. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Furthermore, the issue is waived because appellant did not object at trial and the record on appeal does not contain the transcript of the alternate juror selection. *See* Tenn. R. App. P. 36(a); Tenn. R. App. P. 24(a). It is the duty of the appellant to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect

to the issues which form the basis of the appeal" and will enable the appellate court to determine the issues. Tenn. R. App. P. 24(a). Accordingly, we conclude that appellant has waived this issue and is not entitled to relief.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____

ROGER A. PAGE, JUDGE