Cartwright v. The State.

## JOSEPH CARTWRIGHT v. THE STATE.

CRIMINAL LAW. *Murder in the first degree. Intoxication.* The rule ex
tracted from the decisions of this State in regard to drunkenness in
trials for murder in the first degree is: If drunkenness exists to such
an extent as to render the defendant incapable of forming a premed-
itated and deliberate design to kill, then of course he cannot be guilty
of murder in the first degree; still if drunkenness be not to this ex-
tent, nevertheless the jury may consider the drunkenness in connec-
tion with all the facts to see whether the purpose to kill was formed
in passion produced by a cause operating upon a mind excited with
liquor, not such adequate provocation as would reduce the killing to
manslaughter, but nevertheless such as produced passion in fact and
reduce the killing to murder in the second degree, or whether not-
withstanding the purpose to kill was formed with deliberation and
premeditation, for a drunken man may be guilty of murder in the
first degree if the drunkenness be not to such an extent as to render
his mind incapable of deliberation and premeditation.

---

### FROM MACON.

---

Appeal in error from the Circuit Court of Macon
county. N. W. McCONNELL, J.

J. L. ROARK and Jo. C. GUILD for Cartwright.

ATTORNEY-GENERAL LEA for the State.

McFARLAND, J., delivered the opinion of the court.

The prisoner appeals to this court from a judgment
of death pronounced against him by the circuit court
of Macon county, for the murder of Hugh Sanders.

The prisoner was indicted in said court in January, 1879, for stealing a ·demijohn of wine from a church, was tried and acquitted in April, 1879; the deceased was a witness aganist him on the trial.   Out of this affair the animosity between the parties probably originated.   They were both young men, the prisoner living in the town of Lafayette—the deceased within a mile or two of the town.   Sometime after the trial— precisely how long is not shewn—the prisoner left the county and remained away until a short time before the killing.   It is claimed for the defense that he left from fear of the deceased.   There is proof by several witnesses that from the time of the trial until shortly before the killing, the deceased made threats against the prisoner on several occasions.   In only one instance does it appear that the threat was communicated to the prisoner—this was before he left the county.   The threats in some instances were in substance that the deceased had heard that the prisoner was going to charge the stealing the wine on him, and if he did he would kill him.   On other occasions, he said they could not both live in the same county; that he expected a difficulty with him, and he would be ready for him.   One threat was proven to have been made the day before the killing; but, as already stated, there is no proof that any of these threats were communicated to the prisoner except in the one instance.

One witness proves that a week or ten days before the killing, they met at a spring in Lafayette, when the deceased made some hostile demonstration, and, as

the witness thought, was about to draw a knife, and intimated that he would see the ·prisoner again.

The killing occurred on the 13th of October, 1880, in the town of Lafayette. An hour or two before the killing, several young men, including the prisoner and deceased, were in front of Johnson's hotel. They were engaged in playful conversation. The prisoner had a gun, and in the language of the witnesses, "was drinking," or had been drinking. One of the young men asked him "if carrying a gun made him drunk, if it did he would get him one," and deceased said, "if it makes you drunk, pass it around and we will all take a spree." The prisoner did not seem to take offense at the language.

The company separated, the prisoner and deceased going in different directions. Within an hour or two deceased and two other young men returned, and with Johnson, the proprietor of the house, were on the pavement in front of the hotel, the deceased sitting in a chair leaning back against the house. The prisoner was seen coming towards them, still carrying the gun. Johnson asked deceased if he was not uneasy for fear the prisoner would attack him; he said, "No, we have been at outs, but we have agreed to drop it, and we speak when we pass." This remark was brought out without objection. Prisoner came up—when near where the parties were sitting, turned a little off the pavement and came around directly in front of the deceased, brought down his gun, and said, "G—d d—n you, I suppose you have got something against me," and instantly fired and shot the deceased through the body,

Cartwright *v.* The State.

from the effects of which he died in a few hours. It is fully proven by the three witnesses present that the deceased was unarmed and making no demonstration whatever—the gun was very close to him when fired. The prisoner walked a short distance, then started to run across a field, but was captured and brought back. It was proven by nearly all the witnesses that the prisoner was in the habit of drinking too much. The father, mother and sister of the prisoner prove that he had been drinking for perhaps three years, and their testimony indicates that at times he was subject to *delirium tremens.* They express the opinion that he was not of sound mind, but the effect of their testimony is that he at times had *delirium tremens* from the use of ardent spirits. The other witnesses in the main say he was sane on the day of the killing, and in fact was sane at all times.

His father says he was wild and very drunk and out of his mind on the day of the killing—worse than he had seen him for months. The mother says he at times seemed very much depressed, and said deceased "charging him with stealing the wine, had put him below the respect of decent people." The witnesses pretty much all agree that the prisoner "was drinking" the day of the homicide, but to what extent he was under the influence of liquor their testimony differs somewhat. The witnesses for the State pretty generally say that he was "drinking but not drunk"; but that he was to some extent under the influence of liquor fully appears.

Prisoner's father, who was postmaster, proves that

shortly before the killing the deceased came into his office and asked for a letter, had his hands in his pockets, looked all around and walked hurriedly off. In a few moments prisoner came in, witness told him that deceased had been in, had his hands in his pockets, that he did not like his conduct, and feared mischief, and told prisoner he had better go home; he said he would as soon as he saw Willie Claiborne. He went out and shortly afterwards the killing occurred. A very short time before the killing, prisoner was seen looking in at Claiborne's store, as if looking for some one.

This is a sufficient outline of the case for a proper understanding of the questions presented for our decision.

Upon the subject of drunkenness the court charged the jury as follows: "Voluntary drunkenness is no excuse for the commission of a crime, but it may be looked to, to ascertain whether the offense has been committed or not. We have seen to commit murder in the first degree the killing must be done willfully, deliberately, premeditatedly, and with malice aforethought. This requires certain states of the mind, and the question of the intoxication of the prisoner may be looked to, to see whether at the time of the killing he had these states of mind. Was he so intoxicated that he was incapable of giving the consent of his will to the killing, or of deliberating and premeditating the deed; if he was, then he cannot be guilty of murder in the first degree. But if he was capable of willing, deliberating and premeditating the deed, then

he is capable of committing murder in the first degree, notwithstanding his intoxication, and it can be no excuse for him. The only effect that voluntary drunkenness can have in any event, is to reduce the crime from murder in the first to murder in the second degree. It is never ground of entire justification, except it amounts to insanity, as will hereafter be explained to you."

Again, the judge says: "If you believe, beyond a reasonable doubt, he (the prisoner) shot Sanders in malice, not intending to kill him but did do it, or if you find he was so intoxicated that he was not capable of that deliberation or premeditation necessary to make murder in the first degree, or you have a reasonable doubt how this is, you should find him guilty of murder in the second degree." This is the entire charge upon this subject.

In the case of *Haile* v. *The State*, 11 Hum., 154, the charge was as follows: "Voluntary drunkenness is no excuse for the commission of crime, on the contrary it is considered by our law as rather an aggravation; yet if the defendant was so deeply intoxicated by spirituous liquors at the time of the killing as to be incapable of forming in his mind a design deliberately and premeditately to do the act, the killing under such a state of intoxication would only be murder in the second degree."

Upon a conviction for murder in the first degree the above charge was held to be erroneous. Judge Green, in delivering the opinion of the court, quotes from Judge Reese, in *Swan* v. *The State*, 4 Hum., 136,

as follows: "But although drunkenness iu point of law constitutes no excuse or justification for crime, still when the nature and essence of the crime is made to depend by law upon a peculiar state and condition ·of a criminal's mind at the time with reference to the act done, drunkenness as a matter of fact affecting such state and condition of mind, is a proper subject for consideration and enquiry by the jury. The question in such case is, what is the mental status? Is it one of self-possession, favorable to fixed purpose of deliberation and premeditation, or did the act spring from existing passion, excited by inadequate provocation acting, it may be, on a peculiar temperament, or upon ·one already excited by ardent spirits? In such case, it matters not that the provocation was inadequate or the spirits voluntarily drank; the question is, did the act proceed from sudden passion or from deliberation ·or premeditation? What was the mental status at the time of the act and with reference to the act? To regard the fact of drunkenness as meriting consideration in such a case is not to hold that drunkenness will excuse crime, but to enquire whether the very crime which the law defines and punishes has been in fact committed."

Judge Green says: "In these remarks the court intended to be understood as distinctly indicating that a degree of drunkenness by which the party was greatly excited and which produced a state of mind unfavorable to deliberation and premeditation, although not so excessive as to render the party absolutely incapable of forming a deliberate purpose, might be taken into

Cartwright v. The State.

consideration by a jury in determing whether the killing was done with deliberation or premeditation."

Judge Green also quotes from Judge Turley, in *Pirtle* v. *The State*, 9 Hum., to the effect that it will often be a question whether the killing has been the result of sudden passion excited by a cause inadequate to reduce it to manslaughter, but still sufficient to mitigate it to murder in the second degree, * * * in such cases, whatever will throw light upon the mental status of the offender is legitimate, and among other things the fact that he was drunk; not that this will excuse or mitigate the offense, if it were done willfully, deliberately, maliciously and premeditatedly (which it might well be though the perpetrator was drunk), but to show that the killing did not spring from a premeditated purpose, but sudden passion excited by inadequate provocation such as might reasonably be expected to arouse sudden passion and heat to the point of taking life without premeditation and deliberation."

Judge Green, in commenting on the above extract, in substance and effect says: "The degree of drunkenness which will shed light on the mental status of the offender, is not alone that excessive state of intoxication which deprives the party of the capacity to frame in his mind a design deliberately and premeditatedly to do an act, but in addition any degree of intoxication that may exist, in order that the jury may judge in view of such intoxication, in connection with all the facts and circumstances, whether the act was premeditatedly and deliberately done."

Following these authorities in the case of *Lancaster* v. *The State*, 2 Lea, 573, which was an indictment for an assault with intent to commit murder in the first degree, this court held the following charge to be erroneous, to-wit: "If defendant had been drinking much or little it would be a circumstance for the jury to look to for the purpose of ascertaining whether the defendant's mind was so influenced by liquor as to incapacitate him from forming a deliberate and premeditated design, that is, his mind so much influenced by liquor as to be incapable of contemplating the result of his acts, and if this was the condition of his mind he could not be convicted of an assault with intent to commit murder in the first degree; but if his mind was not in that condition and was not so much influenced by liquor as to prevent him from forming a deliberate and premeditated design, drunkenness would then be no excuse and would not lessen the crime."

The rule to be extracted from these cases is about this: If drunkenness exists to such an extent as to render the defendant incapable of forming a premeditated and deliberate design to kill, then of course he cannot be guilty of murder in the first degree; still, if the drunkenness be not of this extent, nevertheless the jury may consider the drunkenness in connection with all the facts, to see whether the purpose to kill was formed in passion produced by a cause operating upon a mind excited with liquor—not such adequate provocation as would reduce the killing to manslaughter—but nevertheless such as produced passion in fact,

and reduce the killing to murder in the second degree, or whether notwithstanding the drunkenness the purpose to kill was formed with deliberation and premeditation, for a drunken man may be guilty of murder in the first degree if the drunkenness be not to such an extent as to render his mind incapable of deliberation and premeditation.

The conviction for murder in the first degree was affirmed in Swan's case, 4 Hum., 136, although he was intoxicated when the crime was committed.

We are constrained to hold, upon the rule as thus established by these authorities, that the portion of his Honor's charge above set forth is erroneous. The jury were correctly told that if the prisoner was so intoxicated as to be incapable of deliberating and premeditating the deed, he could not be guilty of murder in the first degree; on the other hand, if notwithstanding his intoxication he was capable of deliberation and premeditation, then he might be found guilty of murder in the first degree. This was all well enough; but the error is in making the whole effect of the prisoner's intoxication in reducing the killing to murder in the second degree depend upon whether the drunkenness was to such an extent as to render the prisoner incapable of deliberation and premeditation; whereas, as we have seen, a degree of intoxication short of this may, when taken in connection with the other facts, show that the killing resulted from a purpose formed in passion, and not deliberately and premeditatedly; and although there be no adequate provocation to reduce the offense to manslaughter, yet if in this mode

25—VOL. 8.

the want of deliberation and premeditation appear, it may be reduced to murder in the second degree.

In a case involving life, we do not feel ourselves at liberty to overlook this error, whatever we might think of the facts. The prisoner is entitled to a correct exposition of the law.

The judgment must, therefore, be reversed and the cause remanded for a new trial.