# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
## June 12, 2012 Session

## STATE OF TENNESSEE v. CHRISTOPHER ALEXANDER JONES

### Appeal from the Circuit Court for Gibson County
### No. 8857     Clayburn Peeples, Judge

### No. W2011-01990-CCA-R3-CD  - Filed September 14, 2012

A Gibson County grand jury indicted appellant, Christopher Alexander Jones, for first degree murder.  The jury found appellant guilty as charged, and the trial court sentenced him to life imprisonment.  On appeal, appellant challenges the sufficiency of the convicting evidence. Specifically, he contends that the evidence did not show sufficient proof of premeditation and that his intoxication negated the required culpable mental state for this offense.  After reviewing the record, the parties' briefs, and applicable law, we conclude that the evidence was sufficient to support appellant's conviction.  Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JEFFREY S. BIVINS, JJ., joined.

James B. Webb and Brandon L. Newman, Trenton, Tennessee, for the appellant, Christopher Alexander Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Garry Brown, District Attorney General; and Jason Scott, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Facts

A Gibson County grand jury indicted appellant for first degree murder. The trial court held a jury trial on February 22-23, 2011, at which the parties presented the following evidence:

Lieutenant Rob Ellis of the Humboldt Police Department testified that he was on patrol during the early morning hours of December 6, 2008, when he received a call regarding a gunshot victim at the Kitty Kat Lounge nightclub. When he arrived at the scene around 2:40 a.m., Lieutenant Ellis observed "a lot of commotion, people kind of screaming and yelling and moving at a fast pace all along the parking lot area[,] and it seemed almost like maybe a fight was about to break out in front of the Kitty Kat Lounge." Other officers were on the scene; however, Lieutenant Ellis was the first to enter the club. When he went inside the club, Lieutenant Ellis saw the victim, Ebony Gooch, lying on the floor. The victim was ten to fifteen feet inside of the club, and a group of people surrounded her. Lieutenant Ellis went to the victim to see if she was responsive, and she was not. He stated that the victim had blood around her mouth and nose area, and a small amount of blood was also on the chest area of her shirt. Someone had called an ambulance, which arrived "probably three minutes" after Lieutenant Ellis went inside the club. Lieutenant Ellis assisted the medical personnel with loading the victim onto a stretcher and transporting her out of the club.

After the ambulance transported the victim to the hospital, Lieutenant Ellis remained outside of the club to gather information about what had occurred. While outside, he learned that someone with the nickname "Bump" was involved in the shooting. Lieutenant Ellis later learned that appellant was "Bump." He stated that he left the scene between 2:50 and 3:00 a.m. to begin searching for appellant. Although Lieutenant Ellis had ideas about where he could find appellant, he did not have his address and was unable to locate him.

On cross-examination, Lieutenant Ellis testified that he and Officer Paul Carrier arrived at the scene around the same time. Officer Carrier completed the police report for this case. Lieutenant Ellis knew the victim from working at the police department; however, he had never arrested her. He learned that appellant was "Bump" through Investigator Reynard Buchanan.

Lieutenant Ellis believed that a fight was about to break out because a large crowd of people was in the parking lot "screaming and hollering." When asked why he went inside the club when he arrived although a fight was about to start outside, Lieutenant Ellis explained,

-2-

A lot of times what starts inside kind of spills out outside[,] and it's still continuing on the inside, so although it appeared to be a commotion going on outside, there was no physical fight going on, so the logical thing is . . . to make sure everything's okay on the inside and that's what I did.

He stated that no physical altercation occurred while he was outside. He denied that another police officer was outside the Kitty Cat Lounge.

Robert McKinley testified that his wife, Diane McKinley, owned the Kitty Kat Lounge nightclub in Humboldt, Tennessee. Mr. McKinley further testified that he occasionally worked at the club. He stated that on the night of December 5, 2008, he was working at the club. He was waiting on customers, bartending, and ensuring everything was "in order." Mr. McKinley recalled seeing appellant at the Kitty Kat Lounge that night; however, he did not recall speaking with appellant or serving him alcohol. He said he had known appellant "practically most of all [appellant's] life" through appellant's father. He had known the victim for approximately twenty-four years.

Mr. McKinley stated that he witnessed an altercation that night. During the altercation, someone turned on the lights, and Mr. McKinley "saw some guy . . . holding [appellant.]" The man who was holding appellant escorted appellant out of the club. Mr. McKinley estimated that the man escorted appellant outside of the club shortly after 2:00 a.m. Someone later told Mr. McKinley the altercation was about the victim's taking money that appellant had dropped on the floor. Mr. McKinley observed the victim walking toward the door counting balled up money.

Mr. McKinley began the process of closing the club for the night, and the club's patrons began to vacate the premises. Mr. McKinley said he was behind the bar during this time and heard about two gunshots coming from outside the front door. He looked toward the front door and saw the victim running toward the front door with appellant following her. He said appellant had a gun in his hand and was firing additional shots. Mr. McKinley was in the "immediate line of fire" and hid between two refrigerators to avoid being shot. He estimated he heard a total of about five shots fired.

After the shooting ceased, Mr. McKinley "observed [the victim come] stumbling into the place inside the bar area[,] and when she got not quite middle ways of the front part[,] she kind of fell on the floor." Mr. McKinley said the disc jockey ("DJ") at the club tended to the victim, and several patrons called 9-1-1.

On cross-examination, Mr. McKinley stated that the Kitty Kat Lounge had a $2-$3 cover charge depending on the night. After the altercation, Mr. McKinley discovered

appellant's coat at a table in the back area of the club and presumed he had been sitting in that area before the altercation.

Mr. McKinley testified that he had never had a problem with appellant at the club. He said in the past if he thought appellant was going to cause a problem, he would talk to appellant, and appellant would do as he said. He further said he "didn't necessarily know [appellant] was drinking [that night], but [he] knew it [sic] was something in him." He stated that he thought appellant was not only under the influence of alcohol but was also under the influence of drugs. According to Mr. McKinley, the victim had been patronizing the Kitty Kat Lounge for approximately one year, during which time he did not have any problems with her.

Diane McKinley, the owner of the Kitty Kat Lounge nightclub, testified that she was working at the club the night of December 5, 2008. She arrived at the club between 7:00 and 7:30 p.m. Mrs. McKinley stated that she usually "work[ed] the door" or tended the bar at the club. While working the door, she would collect the cover charge from patrons and check them for weapons. On December 5th, she checked patrons for weapons by using a metal detector wand or having someone pat them down. She said the metal detector wand had stopped working during that time, and she was unsure whether she had used it on December 5th.

Mrs. McKinley testified that she had known the victim through the victim's patronage of the Kitty Kat Lounge. She estimated that the victim visited the club approximately twice a month. Mrs. McKinley had known appellant for seven to eight years because she was friends with his cousin. Mrs. McKinley recalled an incident between appellant and the victim that occurred at the club during the early morning hours of December 6th. She stated that the Kitty Kat Lounge was about to close, and the DJ was playing the last song of the night. Appellant and the victim were dancing, and when the song ended, appellant confronted the victim about taking his money. Appellant told the victim he wanted his money back, and the victim responded that she did not take it. Appellant and the victim began to argue. Fellow patrons held appellant back, and Mrs. McKinley told appellant and the victim that "they had to take it outside, that [they] weren't going to have it in the place[.]" Appellant broke loose from the patrons who were holding him and exited the club.

After appellant left, Mrs. McKinley began closing the club. She was cleaning tables when she heard several gunshots getting louder and closer to the club. Mrs. McKinley said,

> [The victim] had to be at the door at the last shot because it was real loud and
> then she walked in and she just stood there and she looked and then she started

-4-

to walk off, but she fell down on one knee. She got up and she made it to the second table and [spun] around and fell back[.]

A woman entered the club behind the victim screaming, "'He shot her. He shot her.'" Mrs. McKinley testified that she did not see who shot the victim. She looked down at the victim and saw blood on the victim's face. Mrs. McKinley stepped over the victim, ran outside, and called the police. She did not see appellant after the shooting.

According to Mrs. McKinley, appellant and the victim did not have an altercation that night other than the one over the dropped money. She recalled at one point during the night she had to "get on" the victim because the victim was blocking the door to the men's restroom and not allowing the men to enter. Mrs. McKinley also recalled a male patron of the club complaining to her about the victim's grabbing his crotch. Mrs. McKinley again "got on" the victim, and the victim told her that "she was gonna [sic] do right because she didn't want to be barred out of the place."

Mrs. McKinley stated that she did not see appellant with a gun that night. She did not have any other interaction with appellant other than diffusing the altercation about the dropped money. She said appellant drank beer that night. Mrs. McKinley had worked at another club and was familiar with the behavior of people who were drunk. She stated that she did not know if appellant had too much to drink but said he was "really, really upset about his money." Mrs. McKinley further stated that she had never seen appellant that upset.

On cross-examination, Mrs. McKinley testified that the club did not always conduct pat downs, and she was unsure if they were "patting" the night of the altercation. Mrs. McKinley said the person whose crotch the victim grabbed was a transvestite, and the victim's action offended that person. Mrs. McKinley had not had any problems with the victim in the past. Mrs. McKinley did not know whether appellant had drunk any alcohol other than beer that night or if he had been using drugs. She explained that if her patrons were having a good time and not causing problems, she left them alone and did not pay much attention to them. According to Mrs. McKinley, appellant and the victim danced together during the last song of the night and had been "kicking it" all night.

Mrs. McKinley reviewed her statement to Investigator Buchanan, in which she stated that appellant said, "'F[] this'" as he exited the club. The victim stayed inside the club for a little while and did not immediately exit the club behind appellant. Mrs. McKinley said the victim was not angry and was laughing when she left the club. Mrs. McKinley also recalled telling Investigator Buchanan that "if [appellant] had not shot [the victim,] [the victim] was going to tear his a[] up[.]" Mrs. McKinley did not remember telling Investigator Buchanan that the victim had previously "acted up" at the club or that "if [the victim] acted up in the

-5-

club and came at [her] like that that [she] would have to shoot her because [she] couldn't whip her." However, Mrs. McKinley stated that she probably made those statements.

On redirect examination, Mrs. McKinley stated that she did not have a gun and was "making a joke" when she told Investigator Buchanan that she would have to shoot the victim if the victim came at her. On recross-examination, she stated that her statement about shooting the victim was based on her experience with her.

Laquita Wilkes testified that she was at the Kitty Kat Lounge nightclub on December 5, 2008, celebrating her birthday. Ms. Wilkes stated that she knew the victim from being incarcerated with her. She said she knew appellant's name and had seen him around Humboldt, but she did not know him personally. According to Ms. Wilkes, both appellant and the victim arrived at the club before midnight. Ms. Wilkes, who arrived at the club early to set up for her birthday party, described the club as packed from "top to bottom" once additional patrons began arriving.

Ms. Wilkes testified that she saw both appellant and the victim drinking alcohol that night. She also saw appellant and the victim dancing together around midnight. Ms. Wilkes did not see the altercation between the victim and appellant inside the club. She said that she was on her way out the door to put her party items in her car when someone turned on the lights in the club.

Ms. Wilkes stated that while she was outside, the victim came outside. Ms. Wilkes stopped approximately two to three feet from the door and began talking to the victim. Ms. Wilkes recalled that the victim said, "The motherf[] tried to take my money." Ms. Wilkes stated that the victim was upset and showed her a wad of balled up money. The victim returned the money to her pocket and continued to talk to Ms. Wilkes. Ms. Wilkes saw appellant attempting to get to the victim, but someone was holding onto the belt loop of appellant's pants so he could not go toward the vicitm. Ms. Wilkes stated that appellant removed his shirt so he could free himself from the person who was holding onto him, and in the process, he dropped a gun. Appellant reached down, picked up the gun, and pointed it at the victim. When appellant did this, the victim said to him, "I fight n[], too." Ms. Wilkes explained that meant the victim fought men and women. Appellant continued to try to get to the victim. He eventually freed himself, and he and the victim were "in each other's face" arguing.

Ms. Wilkes stated that she decided to go back inside the club. Between five and ten minutes after she entered the club, Ms. Wilkes heard gunshots. Ms. Wilkes stated that she was "just stuck," standing in one spot after she heard the gunshots. Because she was inside of the club, Ms. Wilkes did not see who was firing the shots until after the victim walked

back inside the club. Ms. Wilkes said that as the victim walked back inside the club, she motioned her arm toward Ms. Wilkes and that "blood started shooting out of her mouth." Ms. Wilkes's testified that her cousin hollered, "'She's been shot,'" and the victim collapsed to the floor. Ms. Wilkes went over to the victim after she collapsed and called 9-1-1. Ms. Wilkes stated that she did not see appellant after she went back inside the club.

On cross-examination, Ms. Wilkes stated that she previously served thirty days in jail for assault on a minor. She denied having any felonies or convictions for crimes involving dishonesty on her record. Ms. Wilkes did not recall for what crime the victim was incarcerated.

Ms. Wilkes recalled that appellant had been drinking the night of the incident, but she did not see him drinking a bottle of alcohol that defense counsel showed her during trial. She stated that appellant acted as if he was under the influence of "more than alcohol because [she had] never seen anybody act like that, because . . . he buck jumped all throughout the club. It was like on fast or slow songs, so . . . he was on more than liquor[.]" Ms. Wilkes further stated that she had "quite a bit" to drink that night, but she recalled what happened because "it's a thing that you would never forget."

Ms. Wilkes testified that the only things she heard the victim say that night were "'That motherf[] took my money" and "I fight n[], too." She said no one tried to take the gun away from appellant, and she did not attempt to hold the victim back when the victim began walking toward him. She reiterated that appellant had his shirt off although it was 20 to 30 degrees outside that night. She agreed that appellant "was drunk enough [that] he wouldn't [have felt] it if he had his shirt off."

Tonjia Whitmore, appellant's distant cousin, testified that she was at the Kitty Kat Lounge on the night of December 5, 2008. She did not recall seeing the alteration between appellant and the victim; however, she recalled seeing appellant standing outside of the club. She stated that appellant "seemed like something was bothering him." Ms. Whitmore said appellant never told her why he was upset or what the situation was. She went over to appellant and attempted to calm him and get him to leave the area in her vehicle. She estimated that she attempted to get him to leave for fifteen minutes but was unsuccessful.

Ms. Whitmore testified that the victim came outside while she was trying to get appellant to leave the area. According to Ms. Whitmore, the victim said, "I whip n[], too," and the altercation "just exploded from there." She stated that appellant had calmed down until the victim came out and "got in his face." She tried to hold appellant back, but he got away from her by coming out of his shirt. Ms. Whitmore denied seeing appellant with a gun while she was talking to him and said she first saw the gun when it hit the ground while

appellant was removing his shirt. She stated that appellant and the victim were "kicking and tussling trying to get the gun," and appellant quickly retrieved the gun. Once he picked up the gun, appellant began shooting. Ms. Whitmore said appellant fired about four or five shots and left the scene after the shooting. She did not know where he went or whether he still had the gun with him.

On cross-examination, Ms. Whitmore testified that appellant was angry when she initially saw him outside, but he had calmed and was going to leave the area. She stated, "[T]he only thing I could say, if [the victim] wouldn't have . . . came [sic] out[,] I know we would have been gone." When asked whether appellant had drunk something or taken something that night, Ms. Whitmore answered that appellant was not himself and that in "all the years that [she's known] him[,] [she's] never seen him like that." She stated that initially, many people were not outside when she and appellant were outside, but more people came outside at the same time as the victim. Ms. Whitmore said she did not know whether the people were with the victim or just happened to be leaving the club at the same time. However, she later testified that she thought they were with the victim because many people were gathered around, yet it seemed like she was the only one attempting to restrain appellant.

Ms. Whitmore stated that the victim outweighed appellant by a considerable amount. She further stated that she could not say how appellant reacted to the victim's statement about fighting him. She said the appellant usually worked whenever he could, was quiet, and kept to himself.

Ms. Whitmore testified that she saw the victim get into a confrontation that night with Angela Johnson, another patron at the Kitty Kat Lounge, over a man who was in the club. However, she did not recall the victim "telling Ray to take that Snow Bunny home." Ms. Whitmore reviewed her statement to the police and agreed that she told them the victim said she was going to "bust Ray's head open." Ms. Whitmore did not recall appellant saying anything aloud when the victim got in his face or when he was firing the gun.

Queca Rice testified that she worked at the Kitty Kat Lounge and had known appellant since they were in elementary school. She was working as the bartender at the Kitty Kat Lounge on December 5, 2008. Ms. Rice knew of the victim from "talk around town" and the victim's patronage at the club. She said she was not close friends with the victim or appellant. Ms. Rice did not see the altercation between the victim and appellant but stated that she observed them having a good time "dirty dancing" on the dance floor. She said she knew they were having a good time by their facial expressions.

Ms. Rice said she usually turned on the lights at the club between 2:15 and 2:30 a.m. to indicate the club was closing. On the early morning of this incident, the first altercation between the victim and appellant caused her to turn on the lights earlier than normal. Ms. Rice stated that after she turned on the lights, the victim walked past the bar, and Ms. Rice saw that she had money in her hand. Ms. Rice heard the victim say, "'I'm fixing to take this n[] back his sh[] 'cause I don't want no [sic] problem," as she passed by the bar. According to Ms. Rice, the victim went outside of the club, and Ms. Rice heard a gunshot. Ms. Rice looked at the door and saw the victim come back inside of the club and look up. Ms. Rice said appellant fired approximately three shots at the victim's back. Ms. Rice knew that it was appellant who shot the victim because she "looked at him dead in the face." Ms. Rice stated that the victim "[took] a complete spin around on the floor. One shoe came off and she laid back . . . ." Ms. Rice observed blood coming out of the victim's mouth. Ms. Rice testified that appellant said, "Take that, b[]," when he shot the victim the final time. After appellant shot the victim, Ms. Rice did not see him again. Ms. Rice estimated that approximately five minutes passed from the time she heard the initial shot and the time she heard the additional shots fired as the victim came back inside the club. She stated that she knew it was a gun that appellant was shooting, although she did not see the gun.

Ms. Rice testified that the Kitty Kat Lounge only sold beer; however, the owners allowed patrons to bring their own bottles of liquor. She said the victim had been drinking her own alcohol that she had brought with her. She recalled that appellant purchased one beer from the bar "once or twice." Ms. Rice could not recall whether appellant drank anything else. She said appellant was intoxicated that night, and the victim "probably was gonna [sic] get there." Ms. Rice admitted that she had been drinking earlier that night but denied she was intoxicated.

On cross-examination, Ms. Rice testified that the victim patronized the Kitty Kat Lounge "every blue moon." She stated that the music stopped when she turned on the lights. She remembered seeing appellant holding the gun, but she could not recall what the gun looked like. Ms. Rice acknowledged that she told Investigator Buchanan that appellant was wearing a black sweatshirt and blue jeans when he shot the victim and testified that she was sure that was what appellant was wearing. When asked whether it would surprise her that every other witness had testified that appellant was not wearing a shirt at the time he shot the victim, she answered, "No . . . . Because . . . I don't know what they saw. I'm saying what I saw." Ms. Rice stated that she could not remember whether appellant put on his shirt between shots because "[I]t's been too long ago." However, she said she definitely remembered appellant saying, "Take that b[]."

Ray Dotson testified that he had known appellant for years. He had known the victim, who was his friend, for approximately five years. On December 5, 2008, Mr. Dotson went

to the Kitty Kat Lounge with the victim. He said they arrived around 11:00 p.m. and were "in and out [of] the club."

According to Mr. Dotson, the victim and appellant began arguing over money. He stated that the victim or someone else in their group "supposedly took [appellant's] money or found his money," which led to the argument. Appellant asked the victim if she had taken his money, and the victim replied, "'No, I didn't take your money." Mr. Dotson then told the victim, "Well, if you took this man's money[,] you're fixing to give this man back his money." Mr. Dotson said that all three of them had been "sitting around kicking it," and he told the victim that he did not go to the club for "all this mess." Mr. Dotson testified that the victim "pulled out her money and [appellant] reached off to grab it[,] and she pushed him . . . across the club . . . . [W]hen [appellant] came back he was like, 'Well I've got something for you[.]'" Appellant then left the club. After this, Mr. Dotson told the victim that he was ready to leave.

Mr. Dotson testified that he did not see the victim or anyone else take any money from appellant. He did not know whether it was the victim's or appellant's money that the victim pulled out of her pocket. He stated that appellant did not fall when the victim pushed him because some people held onto him.

Mr. Dotson and the victim exited the club approximately two minutes after appellant. Many people were in the club that night, and Mr. Dotson told the victim to hold onto his jacket so they would not lose each other as they navigated toward the exit. Mr. Dotson stated that when they went outside, he saw appellant wrestling with Ms. Whitmore over the gun. He said Ms. Whitmore was saying, "'Don't do it. Don't do it." He further said Ms. Whitmore rammed appellant against the door, and the gun dropped. Mr. Dotson moved over to a truck and saw appellant come out of his shirt. Appellant then picked up the gun and pointed at the victim, who was coming out of the door. Mr. Dotson recalled the victim saying, "I fight n[], too," to appellant. Mr. Dotson stated that appellant shot the victim approximately two to three seconds after she exited the club.

After appellant fired the first shot, Mr. Dotson ducked behind a truck. While ducking, Mr. Dotson observed the victim turning and going back inside of the club. Mr. Dotson said he then heard four to five more shots. After appellant fired the additional shots, he got into a burgundy vehicle and left the scene.

Mr. Dotson testified that he went back inside the club to render aid to the victim after appellant left the scene. When he entered the club, he saw the victim lying on the floor. Mr. Dotson said he "dropped to the floor because [he] couldn't believe [it]" and kept saying, "'He shot her, he shot her, he shot her[.]"

Mr. Dotson stated that he had not been drinking that night, and he was not under the influence of any drug or intoxicant. He said appellant was drinking alcohol with the victim, and appellant offered him a drink. According to Mr. Dotson, appellant was highly intoxicated.

On cross-examination, Mr. Dotson stated that he recalled appellant's drinking vodka from the bottle that night. Appellant shared the vodka with other patrons; however, appellant drank most of it. Mr. Dotson did not recall appellant drinking beer that night. Mr. Dotson reviewed his statement in which he said appellant had drunk approximately six quarts of beer that night and agreed that his memory was better at the time of the statement than at trial.

Mr. Dotson testified that many patrons in the bar saw the victim push appellant across the bar. He said the victim's pushing appellant was embarrassing for appellant, and the victim was much bigger than appellant. He explained that when the victim made the comment about fighting men, she was leaving the club just as appellant was going back inside. He further explained that after appellant drew his gun, the victim said, "'So it's like that?'" before making the comment about fighting men.

Mr. Dotson recalled that, in his statement to Investigator Buchanan, he said appellant was hollering and went into a rage after the shooting. In his statement, Mr. Dotson also said the shooting was not over the money, it was because appellant "felt like he [had] lost his manhood." He testified that the victim's pushing appellant was an embarrassment because appellant "felt like everybody was laughing." Mr. Dotson also told Investigator Buchanan that during the first altercation, he was "concerned because everybody knew that if [appellant] stood back up with the next lick [the victim] was gonna knock him out."

Sergeant Tony Williams with the Humboldt Police Department testified that he investigated the victim's death. As part of his investigation, he went to Humboldt General Hospital's emergency room to take photographs of and collect evidence from the victim. When he got to the hospital, the victim was already deceased. He observed what appeared to be gunshot wounds to the victim's chest, back, and one of her arms. Sergeant Williams collected the victim's shirt and trousers as evidence and turned them over to Investigator Buchanan.

Investigator Reynard Buchanan, the primary investigator for this case, testified that he arrived at the Kitty Kat Lounge around 3:00 a.m. Other officers were on the scene when he arrived, and they advised him of the information they had collected. Investigator Buchanan then determined the size of the crime scene, possible witnesses, and the evidence he needed to document and collect. After talking to the other officers, he developed appellant as a suspect.

-11-

Investigator Buchanan went back to his office to create a photograph lineup to show a witness. He then returned to the crime scene and showed a witness the lineup. As a result of the witness's response, he began looking for appellant. Investigator Buchanan had an address for the appellant, but he did not find the appellant at that location. It took Investigator Buchanan a month and a day to find appellant. Investigator Buchanan solicited the help of the Jackson Police Department, United States Marshal's office, and "a couple of agencies in Indianapolis, Indiana" to find appellant. When Investigator Buchanan found appellant, United States Marshals had taken him into custody and held him at the Madison County Jail.

Investigator Buchanan testified that he collected two black shirts and a cigar from outside of the Kitty Kat Lounge as evidence. One shirt had short sleeves, and the other had long sleeves. He found the shirts on the street next to the curb in front of the club. He said the short-sleeve shirt was inside the long-sleeve shirt. Inside the club, Investigator Buchanan collected a black shoe that belonged to the victim and a black coat from the back of a chair in the rear of the club. The coat that Investigator Buchanan collected contained an employee identification card for Christopher Ross, which is appellant's alias. It also contained a paycheck stub, photographs of appellant's children, a cellular telephone charger, and "a couple of other items." Investigator Buchanan received the victim's clothing, which consisted of her work shirt from Burger King, pants, socks, one shoe, and bra.

On cross-examination, Investigator Buchanan testified that when officers secured the crime scene, they used a form to track who entered and exited the crime scene. He stated that Officer Carrier filled out the crime scene log and police report for this case. Investigator Buchanan also filled out his own report.

Investigator Buchanan reviewed a printout of the victim's driver's license information. The form stated that the victim weighed 230 pounds. He also identified appellant's arrest intake sheet from the Humboldt Police Department. He stated that the arrest intake sheet listed appellant's weight as 175.

Investigator Buchanan testified that he knew both black shirts found outside the club belonged to appellant because after collecting them, he sent them to the Tennessee Bureau of Investigation's (TBI) crime lab, which determined appellant's DNA was on the shirts. He said the cigar that he found was a "normal cigar." He further said that he found the victim's shoe approximately sixteen feet inside the club. Investigator Buchanan did not think it was odd that he found the victim's shoe sixteen feet from the door. He explained that a witness said that the victim's shoe came off and that someone, such as a member of the medical personnel who responded to the scene, might have kicked the shoe around the room. He did

not know whether anyone had tampered with the victim's body because he was not at the crime scene while her body was there.

Investigator Buchanan testified that he sent bullets and a gun to be tested. The bullets and gun were not ballistics matches. He said that authorities did not recover the gun used in this shooting. Investigator Buchanan did not send the victim's fingernail clippings, which were collected as evidence, to be tested, although appellant's DNA could have been present underneath them. He said he did not have them tested because he had not heard any statement about physical contact involving the victim's fingernails and appellant's skin.

Dr. Miguel Laboy with the Shelby County Medical Examiner's Office testified as an expert in forensic pathology. Dr. Laboy performed the victim's autopsy. During the autopsy, Dr. Laboy discovered a gunshot wound to the right side of the victim's chest cavity. The bullet perforated the victim's chest cavity, and Dr. Laboy recovered the bullet from the chest cavity. The victim had a fractured rib and blood had accumulated in the chest cavity. The victim also had three gunshot wounds on her back. One wound was on the "right back near the center in the mid-section." The bullet causing that wound penetrated the victim's chest cavity. Dr. Laboy recovered a fractured rib and another bullet from the victim's chest cavity. Another of the three wounds was toward the left, mid-center of the victim's back. The bullet that caused this wound perforated the spleen and the diaphragm. The abdominal cavity and the left chest cavity had blood present, and Dr. Laboy recovered the bullet from the front of the victim's chest. The final gunshot wound to the back was on the right side. The bullet that caused this wound "penetrated the abdominal cavity with penetration to the colon on the ascending part." Dr. Laboy removed the bullet that caused this wound from inside of the colon. The victim also had a gunshot wound on her right arm, which "perforated the soft tissue on the arm from the outside to the inside." Dr. Laboy did not recover the bullet that caused this wound.

Dr. Laboy testified that in his professional opinion, multiple gunshot wounds caused the victim's death. He prepared a report containing the findings from his autopsy. Using the report, he explained the wounds to the jury. Dr. Laboy stated that he found neither soot nor stippling around the wounds. He said that was significant because he used the soot and stippling to classify the range of the gunshot. He determined that the range of the gunshots in this case as indeterminate because he did not see any soot or powder stippling.

On cross-examination, Dr. Laboy testified that he extracted a sample of the victim's blood and sent it to the lab for a toxicology analysis. He stated that the victim's blood tested positive for ethanol. He explained ethanol was ethyl alcohol, which was found in alcoholic beverages. He said that the alcohol content in the blood from the victim's chest cavity was .201, which was two and a half times more than the legal limit to operate a vehicle. Dr.

Laboy said a person's behavior after using alcohol depended on how that person used the alcohol. However, he agreed that a blood alcohol content of .201 could make certain people more combative or aggressive and affect their judgment and mental processes. He further said people developed a tolerance for alcohol and drugs, which requires them to use more to get the same effects as someone who is not as tolerant. Dr. Laboy did not know the victim's history for consuming alcohol.

Dr. Laboy stated that he did not receive the clothing that the victim was wearing when appellant shot her. He further stated that if he had the shirt, he might have been able to better determine the range of the gunshots.

Appellant elected to testify in his own defense. He testified that he did not remember everything that occurred on the night the victim died. Appellant had children and knew that the victim had children. He said he felt terrible about what happened and thought about it often. He denied hating the victim or wanting to kill her. He testified that if he could take back that day, he would.

Appellant stated that he worked on December 5, 2008, and his shift ended at 2:30 p.m. After leaving work, he went to the bank and withdrew $200 to "go[] out and just hav[e] a good time[.]" He planned to drink "quite a bit" that night. After withdrawing his money, appellant went to the store and purchased a quart of beer. He could not recall how many quarts of beer he drank but said it was more than one. Appellant had met with some friends that day to drink alcohol and smoke marijuana "blunts." He could not remember how many blunts he smoked, but he knew it was more than one.

Appellant eventually went home, got dressed, and headed to "the Crossing," which is the area in which the Kitty Kat Lounge was located. That night, appellant was riding in the vehicle of his friend "Mac." "Mac" had "a fifth" of alcohol that "Mac," appellant, and two other passengers shared. Before he arrived at the Kitty Kat Lounge, appellant purchased a pint of vodka to drink by himself. He also took five Xanax tablets that he obtained from his cousin. Appellant testified that he remembered purchasing a quart of beer when he got to the Kitty Kat Lounge. Appellant said his drinking and smoking marijuana affected his judgment and ability to think. He stated that he consumed the alcohol and drugs "[j]ust mainly to hang out."

Appellant stated that he did not remember anything that happened at the Kitty Kat Lounge after he purchased the quart of beer. He did not discover that he had shot the victim until his cousin called him the next day. Appellant said he was carrying a gun the night of December 5th because the Crossing's area had a high crime rate. Some men had assaulted

-14-

appellant at the Crossing four or five months before the shooting. He did not know what happened to the gun after he shot the victim.

After appellant discovered he had shot the victim and authorities were looking for him, he became afraid and fled to Indianapolis, Indiana, where his father lived. Appellant eventually left Indianapolis and returned to West Tennessee. United States Marshals apprehended appellant at his attorney's office in Jackson, Tennessee. Appellant stated that he went to his attorney's office because he was going to turn himself in to authorities.

On cross-examination, appellant testified that he knew he killed the victim but did not know why. He did not recall anything that happened between the time he purchased his beer and the next morning. He did not remember being involved in an argument inside or outside the club. Appellant was told that the altercation started over money. He knew the victim and said they were distant relatives. He denied having ever "hung out" with the victim before the night of the altercation. He did not recall the victim being at the bar that night or dancing with her. Appellant had never argued with the victim or had a problem with her before that night. Appellant stated that he remembered standing by the table where Investigator Buchanan found his jacket.

Appellant testified that he purchased the gun "off the streets" approximately eight months before the incident. He said he did not bring his gun with him every time he went out to drink, and he "[j]ust so happened to take it that night." Appellant stated that the gun was "a .22," and it was loaded when he brought it to the club. He kept his gun inside his coat when he went into the Kitty Kat Lounge. He said that no employee of the Kitty Kat Lounge checked him to see if he had a gun. The night of December 5th was not the first time appellant had taken his gun inside of the Kitty Kat Lounge. He agreed that the club was a dangerous place because people brought guns in there.

Appellant testified that he took a Xanax tablet while he was riding in the car with his friends. He took the remaining four at the club before he purchased his beer. That night was appellant's first time taking Xanax. He stated that he took all five because the first was not doing anything for him. Appellant said he normally consumed that much alcohol and drugs to have a good time but had not previously "black[ed] out" when doing so. However, he later admitted he had previously blacked out. Appellant stated that he normally just smoked marijuana and drank alcohol, but occasionally, he also snorted cocaine. He surmised that he blacked out on this night because he took the Xanax tablets.

Appellant testified that he did not remember doing any of the things that the witnesses said that he did that night. He also did not remember what he did with the gun and said he did not try to find out what happened to it. Appellant did not know how he got home from

the club after the shooting and did not attempt to discover how he got home. Appellant said when his cousin told him he shot the victim, he got nervous because he had never done anything like that. Appellant stated that he believed he had killed the victim because his cousin told him the victim was dead, and his first reaction was to leave town.

After hearing the evidence, the jury deliberated and convicted appellant of first degree murder. The trial court sentenced him to life imprisonment.[1] Appellant filed a motion for new trial, which the court denied. From that denial, he now appeals.

## II. Analysis

On appeal, appellant challenges the sufficiency of the convicting evidence. Specifically, appellant contends that the evidence did not show any proof of premeditation and only showed provocation of appellant by the victim. Appellant further contends that his voluntary intoxication negated the premeditation and deliberation elements of first degree murder. The State responds that appellant was not acting in the heat of passion produced by adequate provocation when he shot the victim and that the jury chose to reject appellant's defense of intoxication. Thus, the State asserts that the evidence was sufficient to support appellant's conviction for first degree premeditated murder. We agree with the State.

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the

---

[1] The State did not seek the death penalty or a sentence of life without the possibility of parole. Thus, the trial court gave appellant the only available sentence. *See* Tenn. Code Ann. § 39-13-208(c) (2009).

weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729; *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The jury convicted appellant of first degree murder. As applicable to appellant's case, Tennessee Code Annotated section states 39-13-202(a)(1) states that first degree murder is the "premeditated and intentional killing of another."

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202 (d) (2006). "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Tenn. Code Ann. § 39-11-106 (a)(18) (2006). In reviewing the sufficiency of the evidence, we must determine whether the State established the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). The presence of premeditation is a question of fact for the jury, and the jury may infer premeditation from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

A defendant's "state of mind is crucial to the establishment of the elements of the offense," thus, the State may prove premeditation by circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Several factors support the existence of premeditation

including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *Brown*, 836 S.W.2d at 541-42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)).

Viewed in the light most favorable to the State, the evidence was sufficient to show the necessary premeditation and intent to support appellant's conviction for first degree murder. Appellant posits that the evidence showed that he was acting under the extreme provocation by the victim when he shot her and that there was a "total lack of proof of premeditation." We disagree. There is certainly evidence in the record from which the jury could have found premeditation. The evidence at trial showed that appellant and the victim got into an argument about money, which resulted in the victim's pushing appellant across the bar. After the victim pushed him, appellant left the club, thereby ending the argument. As he left the club, appellant said, "I"ve got something for you," to the victim.

While outside, appellant talked to Ms. Whitmore, calmed himself, and was about to leave. While he was outside, appellant apparently procured a gun. Appellant, who claims to not remember much about that night, stated no one at the Kitty Kat Lounge searched him for weapons. However, Mrs. McKinley testified that someone at the club usually searched patrons for weapons before entering. Appellant said he took the gun into the club with him and kept it in the pocket of his coat, which was at a table in the back of the bar. However, the evidence was consistent that appellant immediately left the club after the first altercation and did not go back to his table and retrieve a gun. Thus, the jury could have inferred that appellant did not bring the gun inside the club, but left the club after the argument and procured the gun outside. While appellant was outside, the victim exited the building. We recognize that some of the witnesses' testimonies were inconsistent regarding when the victim exited the club. However, whether the victim exited the club moments or minutes after appellant is not a determinative fact because "no specific period of time need elapse between the defendant"s formulation of the design to kill and the execution of that plan." *State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992) The altercation had diffused and the victim was not angry when she left the club.

When the victim got outside, appellant attempted to go toward where the victim was standing, and Ms. Whitmore tried to prevent him doing so by holding onto his clothing. During the struggle, appellant removed his shirt so he could free himself from Ms. Whitmore. In the process, he dropped his gun. When he picked up the gun, he pointed it at the victim who was exiting the club. Ms. Whitmore said, "Don't do it," to appellant; however, appellant freed himself and went to the victim. After appellant pointed the gun at her, the victim made a comment about fighting men. Appellant then shot the victim, who was unarmed, in the

chest. The victim turned away from appellant and went back into the club. The evidence surrounding the second altercation is unclear, but it is clear that the victim turned away from appellant and went back inside the club. Appellant followed the victim, who was retreating, and shot her in the back multiple times. After he fired his last shot, appellant said, "Take that, b[]." After shooting the victim, appellant fled the scene. Investigator Buchanan testified that he never recovered the gun used. Thus, the jury could have inferred that appellant concealed it.

The circumstances surrounding the killing were sufficient for the jury to infer premeditation. Those circumstances included appellant's use of a deadly weapon upon the unarmed victim, declaring "I've got something for you" to the victim before exiting the club. They also included appellant's apparently procuring a weapon, his fleeing the scene of the crime and the state, and his concealment of the murder weapon. Accordingly, we conclude that appellant is not entitled to relief on this issue.

Appellant further argues that he was unable to premeditate and form the intent to kill because he was voluntarily intoxicated when he killed the victim. Although the intoxication of a defendant does not justify the crime, its existence may negate a finding of specific intent. *State v. Bullington,* 532 S.W.2d 556, 560 (Tenn. 1976); *see* Tenn. Code Ann. §39-11-503(a) (2006) "[I]f the voluntary drunkenness of the accused exists to such an extent that he is incapable of forming a premeditated and deliberate design to kill, he cannot be guilty of murder in the first degree." *Bullington,* 532 S.W.2d at 560 (citing *Mullendore v. State*, 191 S.W.2d 149, 151 (1945), *overruled on other grounds by State v. Buggs*, 995 S.W.2d 102 (Tenn. 1999)). A jury may consider a defendant's state of intoxication in conjunction with all other facts of the case to determine whether the murder was premeditated or resulted from passion excited by inadequate provocation even if the defendant's intoxication was not sufficient to render him totally incapable of premeditation. *Id*. at 560-61 (citing *Cartwright v. State*, 76 Tenn. 376, 384-85 (1881); *Lancaster v. State*, 70 Tenn. 575, 578 (1879); *Haile v. State*, 30 Tenn. 154, 157 (1850)).

Appellant's claims that intoxication rendered him unable to form the culpable mental state do not persuade us. The jury heard evidence that appellant drank alcohol, smoked marijuana, and took five Xanax tablets before he shot the victim. The trial court instructed the jury, in part, regarding intoxication as a defense as follows:

If you find that the defendant was intoxicated to the extent that he could not have possessed the required culpable mental state, then he cannot be guilty of the offense charged. If you are not satisfied beyond a reasonable doubt that the defendant possessed the culpable mental state then you must find him not guilty.

The trial court properly charged the jury on the issue. As stated above, the trier of fact determines the credibility of the witnesses, any issues of fact, and the weight to be given the evidence presented at trial. *Bland*, 958 S.W.2d at 659. By its guilty verdict, the jury clearly found that appellant acted both intentionally and with premeditation when he shot the victim and that his voluntary intoxication did not negate his specific intent to commit first degree murder. We conclude that appellant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE